JAMES YATES, JR., PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR:

1. In a trial for murder in the first degree, proof of malice and premeditation need not be express or positive, but may be deduced from all the facts attending the killing; and if the jury can reasonably and satisfactorily infer from all the evidence the premeditation or intention to kill, and all the other ingredients which are necessary to constitute murder in the first degree, it is sufficient.

2. Upon a motion for new trial, on the ground that one of the jurors was sleeping during the trial, the evidence as to the fact being conflicting, the Appellate Court will not interfere with the discretion of the Trial Court in overruling the motion.

3. On motion for new trial two witnesses stated that one of the jurors had stated before the trial that if he could get on the jury he would break the accused's neck, but the evidence being conflicting, and the witnesses who testified as to the alleged statement of the juror being related to the accused by marriage, and one of them being an enemy to the juror, the trial judge did not transcend his discretion in overruling the motion.

Writ of Error to the Circuit Court for Osceola County.

The facts of the case are stated in the opinion.

*Mershon & Rogers*, for Plaintiff in Error.

On the trial of an indictment for homicide, where the facts proved by the prosecution show that the defendant claimed to do the act resulting in death in self-defense, the burden of proof rests upon the prosecution to show, beyond a reasonable doubt, that the act was criminal.

State vs. Patterson (45 Vt., 308).

Resistance to an assault, if the latter be not commenced with intent to commit murder, where such resistance is entirely disproportionate to the violence of the original attack,

essentially changes the character of the combat, and renders the assaulted party the assailant.

> (34th Am. Dec., 396.)   (State vs. Stockton, 25 Texas, 777.)

In People vs. Shay, 4 Park. Cr., 351: Under an indictment for murder, where it appeared that the deceased struck with his naked hand and then retreated, when the prisoner followed him up, drew a knife and killed him, a conviction for murder was held right.

> (People vs. Shorter, 2 Comst., 193.)

If the slayer has not begun the fight, or, having begun it, endeavors to decline any further struggle, and afterwards, being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide, excusable by self-defence.

> (4th Blackstone Com., 184.)
> (Cotton vs. State, 31st Miss., 504.)  (Head vs. State, 44 Miss., 731.)

In criminal cases the Supreme Court will weigh the evidence and grant a new trial if the evidence preponderates against the verdict.

> (Green vs. The State, 17 Fla., 669.)

That counsel was permitted to make an unsworn statement of facts in the hearing of the jury, without any admonition from the Court, that it was to be wholly disregarded by the jury, is ground for new trial.

> (Newton vs. State of Fla., 21 Fla., 53).

The *Attorney-General* for Defendant in Error.

MITCHELL, J.: At the Fall Term, 1889, of Osceola Circuit Court, the plaintiff in error, James Yates, Jr., was tried, con-

victed and sentenced to death for the murder of one M. H. Mitchell, and the case comes here upon writ of error.

There is but one error assigned: "That the Court erred in denying the motion of the defendant for a new trial, on the grounds set forth in said motion."

The grounds of the motion for new trial are:

1. Because the jury found contrary to law, and against the law.

2. Because the jury found contrary to the evidence, and against the evidence, and against the weight of evidence.

3. Because the jury found against the law and the evidence.

4. Because the jury found upon the statement of State Attorney J. D. Beggs as to what the testimony was, and not from their own recollection as to what the witnesses swore, to-wit: while W. L. Palmer, Esq., Assistant State Attorney, was addressing the jury, one of the jurors, to-wit: Newton Lackey, asked him what the testimony was as to whether or not Yates wrote a letter at the store, and the said W. L. Palmer gave his understanding, to-wit: that there was no evidence as to his having written.

5. Because while J. D. Beggs, Esq., State Attorney, was addressing the jury, that two of the jurors asked him what the evidence was as to certain points of the case, and that the said District Attorney J. D. Beggs proceeded to tell them what it was, to which conduct defendant's counsel then and there excepted.

6. Because while Jack Woods was testifying in the case, one of the jurors, to-wit: B. F. Cobb, was sleeping, and could, therefore, not have heard the testimony, as will appear by the affidavits of G. A. Worley and Burrill Yates, hereunto attached.

7. Because he was not tried by a fair and impartial jury of his peers, for that one, G. W. Tindall, one of the jurors, on Monday, the 14th day of October, 1889, and after he had been summoned as a juror, said to David Allman that he was summoned as a juror in the Yates case, and that if he could get on the case he would break his neck. And that, on the same day, and at a different time and place, he, the said G. W. Tindall, told S. E. Lightsey that he was summoned here in the Yates case, and that if he could get on it he would break his neck, as will appear by affidavits hereunto attached.

The first ground of the motion was not well taken. The verdict of the jury was in due form and conformed to law in every respect.

There was no exception to the charge of the Court, and the charge is not complained of here.

Second ground. The following is substantially the evidence in the case as shown by the record :

J. L. Hines testified for the State : I know James Yates, Jr., and knew M. H. Mitchell. Was at Mitchell's store, at Turkey Hammock, September 20th, in the afternoon. John Johnson, Dan. Sanders, James Johnson, James Yates and myself were present. Yates is present in court, and witness points him out. I was at the store that night ; store in Osceola county, Florida. That afternoon we all went down to meet the boat. Yates and others went on the boat. Mitchell, myself and one of the Gilbert boys were in the house when the boys came in from the boat. When they came in Mitchell began cursing Lewis Johns, and Yates got up on a corn sack and the rest stood around. This was about 3 or 4 o'clock. We remained at the store until the rest got ready to leave, about a half hour by sun. I didn't leave then. Yates came back after I went to get supper with

me. While I was eating supper he said he had to go back and do some writing. I told him he could do it there, and that I had to go back and put the baby to bed, and he said he would go down there with me. We went back to the store about dusk. We went in and I lit a lamp. As I struck the light to light the lamp, Mitchell, who was lying on the bed, got up. When he got up, he asked what time it was, and then asked us to come in and take a drink ; and we went in and Mitchell and Yates took a drink ; then we went back in the dining-room, sat down and commenced talking. Mitchell, his little child, Yates and myself, all that were present at the time, were talking about things generally. About that time, Allen and Woods came up. They went to cook their supper on Mitchell's stove. About this time Yates and I started to go home, and Yates asked me to come back, and said we ought to go back and help Mitchell take care of his things, that he was too drunk, and they might take all he had. I told him I didn't think they could take his things, that I thought he was able to take care of himself. We went back and Mitchell got to talking about his baby, how he intended to raise her, etc. Yates said there was such a book and asked Mitchell if he had read it, and he said no. Yates got a dictionary and looked up a word and they decided that it was all right. Mitchell claimed that they did not find the word, and they went back in the dining-room. I then said to Yates I am getting sleepy, and think I will go home and go to bed, and we started again and got out of the door when Yates asked me again if I thought we had better leave, and I said I thought he (Mitchell) could take care of himself, and about that time Mitchell came to the door, called me and told me to come back, and I told him I thought I had better go to bed, but he continued to call me, and Yates then said "you have

no use for me." Mitchell then told him he "didn't." Yates then told him he had a due bill against him for $2.00, and Mitchell said he could settle it, and Yates turned round to hand it to him, and Mitchell turned and went back and called me to see that it was done right. I then went back and Mitchell got his books and laid them on the counter and turned to where he had Yates charged with an account, and asked me to run it up for him, which I did and saw due Yates a dollar on the books, and Yates told him that was satisfactory, and asked Mitchell if that was satisfactory to him. Mitchell hunted a while but didn't give an answer, but as Yates told him before that he owed a dollar, he claimed that he didn't owe him but 60 or 65 cents. Mitchell said if Hines says I owe him a dollar it is satisfactory. I told him I didn't know what he owed Yates, but the books showed he owed him a dollar. The account was settled satisfactorily and they went back in the dining-room. It was then supper time. Newton Allen got supper ready and they were eating. I and Mitchell were talking about his baby, what he intended to do with her, etc. He said he would send her to a convent, and I told him I thought it was the best place to send her to, and he said he thought a good deal of me, and Yates spoke then and said "you intend to raise the girl up for him." Mitchell said we are not talking about that, and I spoke and said we didn't mean anything of that kind, and Yates said he didn't mean any harm, and that he would not have said it if it meant any harm, and made an apology for it. Then he began talking to Mitchell about it being a wonder that people didn't steal everything he had while he was drunk. Mitchell told him that they would not steal it all unless they brought wagons. Yates said they could bring wagons. Mitchell said if they did he could start again, and that they had taken his things

once.   Yates told him that if it were not for his friends the
people  would  steal what  he had, and Mitchell  told  him
again that he  could start again.   Yates said he  didn't see
how he  could, as  his friends  had  to come  there  and take
care of  his things.   Mitchell replied that he had dogs, and
Yates asked  him if  he thought  more of  his  dogs  than  of
his friends.   Mitchell said he did.   Yates told him he didn't
like  for him to pass any of his insinuations, and  asked him
if  he thought  that  his  dogs  were  better than   he   was.
Mitchell  replying,  said  he  did,  then  Yates  slapped  him.
Mitchell picked up a butcher knife off the table and started
towards Yates, and Yates drew his pistol.   Yates said some-
thing  when he  drew the pistol that I did  not  understand,
and  when  Mitchell started  towards Yates he, Yates, backed
in  front of  the  door  in  there, and I  said to  Mitchell as he
started to  pass him, "if you are  going to cut up that way I
will leave," and  I started out and went out.   I said nothing
to Yates when  he slapped Mitchell.   When Mitchell picked
up the knife I said to them they could not do that.   Just as
Yates slapped  Mitchell I said to him  that I would  not pay
any attention to Mitchell, and  not  start any  fuss, that  he
had better go, and I went on out.   After I went out I heard
Mitchell  say to him "to  meet him half  way."   On my way
up to Bass' I heard the report of a pistol.   It was not long
after I left the store before I heard  the report of a pistol.  I
had  got off I  suppose about  50 or 75 yards.   I went on to
where I was stopping.   Went back to the store next morn-
ing.   Saw Yates that night after I left the store.   He came
to where I  was  stopping about a half hour afterwards.   I
was  sleeping  in  Bass'  store  and  Yates came  there.   He
called me  and I  went out to him.   When  I  went  out  he
asked me  where his  horse was.   I told him he  was in the
pasture, and I  asked Yates what he had done.   He said he

had shot his pistol off, and after Woods came up, Yates came to me and I told him that Woods said that Mitchell was shot, and asked him if he did it. He told me that when Mitchell had his pistol drawn on him he knocked his hand back and his pistol fired. Heard only one shot. Went back to the store next morning; did not go back that night. I went to the store early next morning, by the time I could see. Yates, Allen and Padgett were with me; went in the store, the lamp was still burning that we left there that night, and we found Mitchell there dead. He was lying stretched out by the tin of oil, his head against the door, his hands in this position (indicating) and the pistol in his right hand with the forefinger on the trigger. Think his elbows were resting on the floor. I went for Williams, a Justice of the Peace; saw the body examined; saw a wound on it, on the left breast below the nipple. The body was lying by the oil between the front door and the centre of the store. When I left the store that night Yates was standing up and Mitchell had started towards the door of the store and I went out. From where we found the body to where I last saw Yates in the house was just in the next room—about 5 or 6 feet. I think it was about 3 feet from the door where he was standing. He was standing in the dining-room, and Mitchell's body was in the other room of the store. I am familiar with the premises there. When Mitchell started at Yates with the knife, Yates stepped back. After passing Yates, Mitchell went into the store. I left Yates in one room, and Mitchell was found in the store, in the next room, the partition was about 2 or 3 feet wide, and his feet were about 5 feet I guess, may be more, from where I left Yates to where I found Mitchell the next morning. It was an open door there. Don't know whether Yates could have shot Mitchell from where I last

saw him to where I found Mitchell the next morning or not, without passing through the partition door. They were opposite the door when I left. When I left, I went out the dining-room door. When going out, I passed by Yates. Yates was as near the door that I went out of as I was and he was standing up. It was Mitchell's house; he was lying there. Yates slept with me the night of the killing. He went off; said he was going to Pine Castle, and then coming here (Kissimmee).

On cross-examination the witness testified that there was a conversation between Yates and Mitchell. While they were talking, Yates pulled out his pistol and laid it on the counter, and Mitchell asked him what he was going to do with it. Yates offered to swap pistols with Mitchell, but Mitchell said he wanted to sell his, and Yates said he would like to sell his. Mitchell was pretty drunk when he came off the boat and went to sleep about 3 or 4 o'clock. He was cursing and rearing, and got after Lewis Johns with his pistol until we got him to stop. Yates was speaking kindly to Mitchell when talking to him about there being danger of his losing his property. Don't know exactly how far I had got from the store before I heard the shot. It might have been more or less than fifty yards. I was traveling in an ordinary walk. When Mitchell was going to the store I thought he was "stepping pretty peart." He seemed to be mad; don't know whether he was excited or not. I left Woods in the store at the time—he was at the table. There was nothing to have prevented Yates shooting Mitchell as he walked off. Think itchell's pistol a 38, a self-cocker.

On re-direct examination the witness testified Yates could have gone out of the house before I heard the pistol shot; he could have gone out as I did.

J. Woods testified for the State that he knew Yates and Mitchell. Mitchell lived at Turkey Hammock. I was at Mitchell's on the 20th of September last; was there a little after dark. Yates was there; saw Yates, Hines and Mitchell there, also a little girl. Witness also related the conversation between Mitchell and Hines about Mitchell's little girl. During the conversation Yates said to Mitchell, "that you don't want me about you," and witness thinks Mitchell said he "didn't." Witness also related the commencement of the difficulty, but does not say that he saw Yates slap Mitchell. Continuing, witness testified: Mitchell walked on in the store; he walked on around the partition and directly came back to the door with a pistol in his hand. I got up from the table and walked out of the house. Hines and Allen had already gone out. When Mitchell started towards Yates, Yates drew his pistol; he just stepped back and let Mitchell pass on by going into his store, that was when he came back with the pistol in his hand. Don't remember to have heard Yates say anything to Mitchell, only to cut if he wanted to. Yates then had his pistol in his hand. When Mitchell came back with his pistol in his hand I heard him tell Yates to meet him half way, that he was going to do so. That was before I went out of the house. When I went out I left Yates standing in front of the door near the corner, about a foot from the bed—the door leading into the store. I had just got out of the door when I heard the pistol fire—don't think more than ten feet from the door. I heard a noise like something fall, as the pistol fired. In a very short time after the pistol fired Yates walked out of the house. He went off in the direction of Bass' store. He said nothing to me. At the time the little girl was sitting in a chair at the table screaming, and I went in and brought her out of the house. Shortly

afterwards, I carried the child to Bass'. I saw Yates when I went to Bass'. He asked if I had seen anything of Mitchell, and I told him I had not. When I saw Yates at Bass' he said that Mitchell had his pistol presented in his face and was going to shoot him, and that he caught his arm and shoved it off and the pistol fired off. Don't remember whether he said it was Mitchell's or his own pistol that was fired. Yates said nothing to me about the shooting of Mitchell the next morning. I think he said something to me about friendship. I told him if he did it, for I asked him if he did it, but he never told me whether he did it or not. I said to him then, "Jim, you know what you have done," and he said it looked like he had to do it or be killed himself, that Mitchell had his pistol presented in his face ready to shoot, and *he then asked me if I saw him do it, and I told him I didn't.* This conversation was after Mitchell was found dead. Witness then testified as to the position of Mitchell's body, just about as Hines did.

On cross-examination, the witness testified that Yates' manner towards Mitchell when advising him about leaving his store open, seemed to be kind. When I left the store, Mitchell was advancing towards Yates. At this time, Yates had moved up a little towards the door where Mitchell was. In going out, Yates would have to pass in front of the door, in going out of the door I went out of. That was the only door without going through the store. The next morning, Yates said he was going to Pine Castle, and then would come back and give up.

On re-direct examination, the witness testified : I don't know how long Mitchell was out of my sight when he went out of the kitchen or bed-room to the store; not very long. I don't know whether he was gone long enough for Yates to have gone out; "it looks to me like if he had time he could have gone out."

On re-cross examination, the witness testified : I don't know how long after he went in the store before he came back; don't know where Mitchell kept his pistol. He would have had time to walk ten steps and back; he went and came back as quick as he could, it looked to me. He returned saying to Yates, " meet me half way, I am ready for you."

Newton Allen testified for the State: I knew Mitchell, and points out Yates. Knew of the difficulty in which Mitchell was killed. Saw Hines, Mitchell and a baby in the store. I cooked supper on Mitchell's stove inside of the door in Mitchell's bed-room. Witness testified as to the transactions and conversations which preceded the difficulty, substantially as Hines did, and then said: "Yates asked Mitchell and said, if you had no friends you would lose all you had, and when he repeated the words again, Yates got up and started towards him, and Mitchell told him he had dogs he thought more of than his friends, and Yates slapped his jaws; in that time he turns back and gets his butcher knife and started towards Yates, and Yates backed back to the corner and let him pass ·by." If Yates had anything in his hand I did not see it. When Mitchell went out I left; I was the first to get out. Yates walked out directly after the pistol fired, and I heard a lumbering in the house. Yates walked about ten feet from me, and I heard him cock his pistol.

Woods being re-called by the State, testified : When I left Mitchell's store that night, I didn't see any one in there but Yates and the little girl. These were the only persons I saw in there just as I stepped out, and I had only got about ten feet from the door, when the shot was fired. I saw a little place ·of blood on Mitchell's body that looked like something went into his breast. It looked like it might have been a bullet-wound; did not examine it closely.

G. W. Rowland, testified for the State: I know the defendant. Remember when Mitchell was said to have been killed; I saw Yates afterwards at my house. Yates came to my house about the last of September, and was talking to my wife, his aunt, and I heard him say: "Aunt Sarah, I have bad news to tell you." I inquired what it was, and he said he had killed a man down the river, that it was Mitchell he had killed, and that he had killed him in self-defence.

On cross-examination, the witness testified: Yates did not tell me the circumstances, only he said Mitchell was right in the act of shooting him, and that he had to kill him in self-defense. He spoke of surrendering himself as soon as he attended to some business.

Lewis Jones testified for the State: I was on the jury that held the inquest on Mitchell's body. I was present when the pistol was taken from Mitchell's hand, and it was loaded, every barrel; saw the wound on the body; it looked like a ball went into his body. I never examined a wound before, a shot hole that way. It was a small hole right in there, (indicating the place.) There was a sign of powder on the shirt. There was no physician present.

On cross-examination, the witness testified: None of us inserted anything in the wound to see how deep it was. The wound did not go through the body, but into it. It bled but little.

John M. Lee, testified for the State, that according to the official maps, Mitchell's store is in this (Osceola) county.

The following is Yates' statement to the jury: "I was a friend to the old man, and he insulted me several times and I taken it. He started towards me with his knife, and I gave back, and he threw down his knife and went in and got his pistol, and I started out of the door. He came to

the door with the pistol in his hand, and threw it up and struck it in my face, and I hated to do what I did, but I had to do it to save myself. Well, I was a friend to him, and hated to do it. That is all I have to say."

It is not claimed by counsel for the accused, that he did not commence the unfortunate difficulty which culminated in the death of Mitchell, but it is insisted that notwithstanding Yates was the aggressor, the deceased used more force than was necessary to repel the assault made upon Yates; in other words, that when Yates slapped Mitchell, he, Mitchell, armed himself with a pistol, renewed the difficulty, assaulted Yates with the pistol and put him in imminent danger of losing his life, or imminent danger of bodily harm at the hands of Mitchell, and, if the position thus contended for was borne out by the evidence, and the accused had discontinued the difficulty already commenced and honestly shown an intention to avoid further trouble with the deceased, and at this time Mitchell had assaulted him under such circumstances as to induce the accused to honestly believe that he was in imminent danger of losing his life, or was in imminent danger of great bodily harm, the homicide at most would have been manslaughter; but unfortunately for the accused, the evidence does not sustain the assumption that the accused had at any time abandoned the difficulty; on the contrary, the accused evinced a willingness to renew the conflict at any time. After Mitchell was slapped by the accused, and upon his taking up the knife and starting towards Yates, Yates drew his pistol and said to him, " cut if you want to," thus showing a readiness and willingness to renew the difficulty. When Mitchell threw down the knife, went from the dining room into the store, the witnesses, except Woods, left the dining room, but what did the accused do ? Did he, after provoking the

difficulty with Mitchell, a drunken man, show a disposition to avoid further trouble by leaving Mitchell's house (with perfect safety) as others had done. No, but he remained, and after the last witness had left the dining room, he shot Mitchell down in the presence of his little child, and the evidence shows that at the time he fired the fatal shot, that he was so close to Mitchell that his clothes were powder burnt. As to the position of the parties at the time the shot was fired, there is no evidence save the statement of the accused. He says that on returning from the store Mitchell had a pistol in his hand, (this is corroborated by Wood's evidence,) which he thrust in the face of the accused, and that the accused then shot in self-defence. The evidence does not, we think, show a case of self-defence. The necessity that will justify the slaying of another in self-defence is such that the party should not have wrongfully occasioned the necessity; for a man should not, in any case, justify the killing of another by a pretense of necessity, unless he was without fault in bringing that necessity upon himself. Vaiden vs. Commonwealth, 12 Grattan, 717; Hayes vs. State, 17 Ga., 465; 1 Bishop on Criminal Law, Section 844; State vs. Neeley, 20 Iowa, 108; Adams vs. People, 47 Ill., 376; State vs. Starr, 58 Mo., 270.

The only evidence in the case that tends to show that Mitchell, on his return to the dining-room from the store with the pistol in his hand, made an effort to assault the accused, is the defendant's own statement. This statement the jury evidently did not believe, and, under all the circumstances, we are not prepared to say they were not warranted in not believing it.

There is a very significant fact shown in the evidence of Woods, who certainly was not a willing witness for the State. He says that on the morning after Mitchell was

killed he had a conversation with Yates, and that in the conversation Yates asked him if he would be his friend, and then asked the witness if he seen him shoot Mitchell. This was after Yates had made different and conflicting statements as to the shooting, and then to ask the witness if he saw it, casts great suspicion upon the statement of the accused as to how the shooting occurred.

Under our statute, to establish murder in the first degree, it devolves upon the State to prove all the elements required to constitute murder in this degree. This proof, however, need not be express or positive. It may be adduced from all the facts attending the killing, and if the jury can reasonably and satisfactorily infer, from all the evidence, the existence of the intention to kill, that the killing was unlawful, malicious and from a premeditated design to effect the death of the person killed, it will be sufficient. State vs. Underwood, 57 Mo., 49. The jury in this case, under the evidence and the law given them by the Court, convicted the prisoner of murder in the first degree.

And after giving to the whole evidence that careful consideration demanded by the gravity of the issue involved, and after examining and scrutinizing every fact and circumstance disclosed by the evidence, our opinion is, that the finding of the jury is sustained by the evidence, and consequently, that the Court below committed no error in overruling the motion to set aside the verdict of the jury as being against the evidence.

The fourth and fifth grounds of the motion may be considered together. During the trial, two of the jurors asked the State Attorney, in the presence of the Court, what was the evidence upon certain points, and the State Attorney requested the stenographer to turn to the evidence and see what the evidence was, but to this the defendant objected

and the Court sustained the objection. There can certainly be nothing in these grounds of the motion.

The sixth ground of the motion was not well taken. After the trial closed, the defense introduced certain affidavits for the purpose of showing that Cobb, one of the jurors, was sleeping while one Jack Woods was testifying in the case. The State filed counter affidavits, and among others that of the juror, in which he stated that he was not sleeping as charged, and that he heard the whole of the evidence. The witnesses for the defendant stated, upon belief, that the juror was sleeping, which is fully met and overthrown by the juror's statement that he was not at any time sleeping. But if the juror was sleeping, and that fact was at the time known to the accused or his counsel, it should have been brought to the attention of the Court, but failing to do so, the objection, if it could be called one, was waived. Baxter vs. People, 3 Gilman, 368; Cogswell vs. State, 49 Ga., 104.

Seventh ground of the motion. Upon the motion for new trial, the defense introduced the affidavits of C. E. Lightsey and David Allman, for the purpose of showing that the accused was not tried by a fair and impartial jury, in that the juror, Tindall, had stated to each of the affiants that if he could get on the jury he would break Yates' neck. Counter affidavit of Tindall was filed by the State, in which he states, most positively, that he had made no such statement either to Lightsey or Allman. The accused states that he did not know of the statements alleged to have been made by Tindall until after the trial of the cause, and if it was clear that Tindall made the remarks imputed to him, it would be ground for setting aside the verdict.

When affidavits are taken as in this case, and the evidence is conflicting, the verdict will not be set aside, unless

manifest injury has been done the accused, which is not shown in the case at bar. Romaine vs. State, 7 Ind., 63; Commonwealth vs. Knapp, 10 Pick., 477. Such questions as this must necessarily be left largely to to the discretion of the trial judge who may know the witnesses and be able to judge of their credibility. As to the discretion of the trial court in such cases, see People vs. Taing, 53 Cal., 602; People vs. Vasquez, 49 Cal., 560; People vs. Cotta, *Ibid*, 166:

The evidence in the case at bar shows that both Lightsey and Allen were distantly related by marriage to the accused; that Allman was a personal enemy to the juror; and it also shows that Lightsey was present when the trial was in progress, and it is remarkably strange that if it were true that they had heard the juror Tindall make the remarks which the witness swore he did make, and neither of them said anything about it, until the trial was over. That the trial judge believed the statement of Tindall, and did not believe those of Lightsey and Allman, cannot be doubted, and, under the circumstances as shown by the evidence, we will not say that the judge's conclusion in the matter was not correct. In the case of Irvin vs. State, 19 Fla., 872, motion was made for new trial and the affidavits of three witnesses were introduced to show that one of the jurors had stated before going on the jury that if he was on the jury he would hang the accused. Counter affidavit of the juror was filed in which he denied the statement imputed to him, and the Court held that "aside from these considerations, Coburn, (the juror), by his affidavit, sets the question at rest. He has no recollection of having used the expressions as charged in several affidavits presented by the defendant on the motion. He says he had not informed himself of the circumstances of the killing, and that when he was sworn as a juror he had no

existing or formed opinion as to the guilt or innocence of the accused, and was absolutely without any previously formed opinion. *" This may be said with reference to the juror, Tindall, he had shown himself fully competent as a juror, and under the decision in Irwin's case, the Court below committed no error in refusing to grant a new trial upon the ground of the alleged incompetency of Tindall. To allow parties, after the close of an important case, to come in and file ex-parte affidavits, and thus set at naught the finding of a jury, would be equivalent to doing away with jury trials. In this case the trial judge fully examined into all the facts connected with the alleged incompetency of Tindall, and after doing so, in the exercise of a sound discretion, refused to set aside the verdict.

Upon a careful consideration of the whole case, we see no cause for reversal, and, therefore, the judgment of the Court below is affirmed.