LEO McGOWAN, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

## Division A.

## Opinion Filed January 16, 1925.

1. Where a verdict in a criminal case is attacked upon the ground that one of the jurors engaged in the trial of the case had disqualified himself by the expression of an opinion as to the defendant's guilt prior to the trial, a clear and unequivocal statement by the accused and his counsel that they were ignorant of the disqualifying expressions before the jury was impaneled, that they exerted due diligence to discover the existence of any such disqualification on the juror's part, is required before the objection to the verdict will be entertained.

2. Where a verdict in a criminal case is attacked because of the alleged disqualification of a juror because of pretrial expressions of adverse opinion as to the guilt of the defendant the court may consider affidavits or take evidence as to the truth of such allegations and the judge's judgment in the matter will not be disturbed unless it is clearly apparent that he abused his discretion.

3. After verdict all presumptions of law are in favor of the juror's competency and the burden of proof is upon one who attacks it.

4. Evidence examined and found sufficient to sustain a verdict of murder in the first degree.

A Writ of Error to the Circuit Court for Columbia County; M. F Horne, Judge.

Judgment affirmed.

*Edgar W. Waybright,* for Plaintiff in Error;

*Rivers Buford,* Attorney General, and *Marvin C. Mc-Intosh,* Assistant Attorney General, for the State.

ELLIS, J.—The plaintiff in error, hereinafter referred to as the defendant, was at the Spring Term of the Circuit Court for Columbia County, 1923, convicted of the murder of H. A. Revels, chief of police of the City of Lake City, on the 29th day of November, 1922.

Three men were jointly indicted for the commission of the crime, the defendant, Otto Sealey and Ted Easterly. Upon arraignment they pleaded not guilty. Upon motion of the State a severance was granted and the defendant went to trial.

There was a verdict of murder in the first degree with recommendation to mercy. A motion for a new trial was overruled and the defendant sentenced to life imprisonment.

Two propositions are urged by counsel for the defendant why the judgment should be reversed and a new trial granted. One that a juror named B. H. Dunbar, Sr., had previously to the trial in which he sat as a juror expressed his opinion that the defendant was guilty and should be hanged. The motion for a new trial, which was made and submitted and denied upon the day the verdict was rendered, May 12, 1923, contained as one of the grounds for setting aside the verdict the averment "That one of the jurors, B. H. Dunbar, Sr., was disqualified to sit in the case, because he had formed and expressed an opinion as to the guilt of the defendant and made the statement prior to his being drawn and summoned on the jury, words to the effect that the defendant Leo McGowan was guilty of

the murder of Hardy Revels and should be hung." The motion was supported by the affidavit of the defendant to the effect that he had been informed since his conviction that the juror, Dunbar, "was disqualified to sit in the case because the said B. H. Dunbar had formed and expressed an opinion as to the guilt of the defendant, and made the statement prior to his being drawn and summoned in the jury words to the effect that he, Leo McGowan, was guilty of the murder of Hardy Revels and should be hung."

Judgment was entered May 12, 1923.

At the time the motion for a new trial was submitted testimony of two witnesses and the defendant was taken in support of it. The defendant said that he did not know that the juror had expressed such an opinion and "would not have had him on there" if he had known it. The two witnesses, a man named Irvine and another named Murphy, testified that what the juror said in substance was, that he was afraid "if those boys were not convicted, that it would not be safe for him or for any other person to walk the streets of Lake City." When the juror was examined upon his *voir dire* he said that he did not know the defendant personally but had heard of him "in and around Lake City," that he knew none of the facts in the case, that he did not attend the preliminary hearing of the defendant, had not heard any of the witnesses, that he had talked with no one about the case, had no bias or prejudice for or against the accused, would be guided solely by the evidence in the case and charge of the court, knew nothing that would disqualify him from acting as a juror, had formed and expressed no opinion as to the guilt or innocence of the defendant, that he had never been a defendant in a criminal case, was sixty-five years old and believed in the infliction of capital punishment for crime. The juror was fully questioned by counsel for the State and defendant.

Fourteen days after the motion was denied, affidavits of three of the counsel for the defendant were filed to the effect that they were "ignorant of the fact" that the juror had expressed an opinion as to the guilt of the defendant prior to the trial. On the same day, May 26, 1923, counsel for the State filed their affidavit to the effect that when the motion was read to the court "no supporting affidavit or affidavits were submitted to the court in the support of the said motion by counsel of record for the defendant," and that counsel for the State submitted to the court for its consideration the case of Irvin v. State, reported in the 19th Florida Report at page 872. The affidavit of B. H. Dunbar was also submitted in which the affiant denied the statements alleged by the witnesses Irvine and Murphy to have been made by him concerning the guilt of the accused.

Aside from any consideration of the affidavits submitted by counsel on May 26th no error appears in the action of the court denying the motion for a new trial upon the ground of the alleged disqualification of the juror Dunbar.

As between the answers of the juror upon his *voir dire* examination and the testimony of the two witnesses, Irvine and Murphy, the court accepted the former as being true.

There was no error apparent in that conclusion because even if the juror had made the remark attributed to him it could not reasonably be construed as the expression of an opinion by him that the defendant was guilty of the murder of Mr. Revels and should be hanged. Nor does it appear that counsel could not by due diligence have discovered the fact of the alleged expressions before the jury was empaneled. See Irvin v. State, 19 Fla. 872; 20 R. C. L. 241.

In a matter of this character where a verdict is attacked upon the alleged disqualification of a juror and the evidence of such disqualification is supported by *ex parte* affi-

davits, the rule requiring a clear and unequivocal statement by the accused and his counsel that they were ignorant of the disqualifying expressions before the jury was empaneled, that due diligence was exerted by them to discover the existence of any such disqualification, and that the matter must be left largely to the discretion of the trial judge who may know the witnesses and be able to judge of their credibility obtains in this State.   See Yates v. State, 26 Fla. 484, 7 South. Rep. 880.

After the verdict all presumptions of law are in favor of the juror's competency and the burden of proof is upon one who attacks it.   See 8 Ency. of Evidence, 986.

The next proposition upon which plaintiff in error relies for a reversal of the judgment is that the evidence was insufficient to support the verdict.   We have carefully read all the evidence as presented by the bill of exceptions.   We have read closely that which was adduced in behalf of the defendant as well as that offered by the State, and are of the opinion that it amply justified the verdict.   The case was ably presented to the trial court by counsel; the trial was apparently free from error, conducted impartially, and there appeared to be no excitement among the people and undue influence exerted by those upon either court or jury.

It is true that the citizens of Lake City raised a fund to defray the expense of procuring evidence and discovering the perpetrators of the crime.   Indeed in view of the lack of public funds provided by proper authority for such purposes it is not a matter of surprise that the law abiding and cultured people of the city of Lake City should contribute of their private funds for the discovery of the persons who committed the crime.   And it is more a matter for favorable comment, upon the self-restraint of our people, than adverse criticism, that in the presence of such a crime committed in a city of this State the people in whose midst

it is committed can contribute of their private funds to the end that justice may calmly and impartially be administered in the houses and by the officers provided by law for such purpose.

In the prosecution of this case the theory of the State, as the evidence developed it, was that near the City of Lake City there existed certain districts in which a comparatively small number of people were engaged in practices subversive of law and morality and out of it came the defendant, whose propensities for lawlessness lead him into frequent disturbances of the peace in the city upon the occasions of his visits there. That he had frequently been arrested by the city authorities, among whom was the chief of police, Mr. H. A. Revels, the deceased, who had personally, on one or more occasions, arrested the defendant; placed him in the city jail and appeared against him. In this situation the defendant, who a week or so prior to the assassination of the officer had gone away from the city, developed a violent hatred of the officer and frequently threatened his life. About a day or two before the commission of the crime the defendant returned to the house of the woman with whom he had illicit relations and who was the proprietress of a house of prostitution and planned the murder of the policeman.

The crime was committed on the night of November 29, 1922, in the City of Lake City near the post office in front of a furniture store to which the policeman had gone to purchase some blankets for prisoners in jail, who, a few minutes before, had burned those in their cells. An alarm of fire had been given; the officer had gone there and returned to the store to get a new supply of blankets, and while on the street, either sitting in his automobile or standing near it, the defendant and his associates fired upon him from a yard near by, in which they had concealed themselves in a hedge of bamboo or reeds. A shot-

gun and pistols were used in the assassination. Many shots were fired upon the unsuspecting officer. As a result of the wounds received he died, either that night or early next morning, at the hospital to which he was immediately taken.

That the defendant and his associates made their escape in two automobiles and were recognized by several persons as they made their way out of the city and to the house of defendant's mistress.

The State introduced evidence to establish every feature of such theory of the crime. The motive, the threats, the presence of the defendant at the jail when the alarm of fire was given, his escape in the automobile on the north road across the mile creek in the direction of the house of the woman with whom he had illicit relations and his confessions of the crime afterwards when in custody of the officers.

Much evidence was introduced by the defendant to break down the case made by the State. Much of such evidence was met by the State which attacked the credibility of the witnesses by evidence tending to show their interest, both in the defendants and his co-defendants, their immoral lives and unreliability as truthful witnesses.

A great deal of evidence was taken. It was in part positive, in part circumstantial, much of it contradictory or conflicting. The defendant's defense was an alibi which he sought to establish by some of the inmates of the house of ill fame and the two male frequenters of that place who said they were there when the crime was committed in the city.

It was the province of the jury to judge of the weight of the evidence and the credibility of the witnesses; to reconcile conflicting testimony, if possible, and if impossible to reject that which they considered unworthy of belief. In studying the evidence presented to them, we are of the

opinion that they were amply justified in their conclusions and that the verdict was fully supported.

In this view of the case the judgment is hereby affirmed.

TAYLOR, C. J., AND BROWNE, J., concur.

WHITFIELD, P. J., AND WEST AND TERRELL, J. J., concur in the opinion.