65 So.2d 77 (1952)
NORTH
v.
STATE.
Supreme Court of Florida, en Banc.
October 21, 1952.
Rehearing Denied April 10, 1953.
*78 John R. Parkhill and C.J. Hardee, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., and Reeves Bowen, Asst. Atty. Gen., for appellee.
MATHEWS, Justice.
This case results from the death of Mrs. Betty Albritton at her farmhouse in Polk County under mysterious circumstances. Only the appellant and Mrs. Albritton were present at the time of her death. The appellant was indicted by a Grand Jury of Polk County, Florida, for murder in the first degree. He was tried in the Circuit Court of that county and the jury returned a verdict finding him guilty of murder in the first degree without any recommendation for mercy.
On the second day of the trial the appellant filed motion for continuance which *79 was denied. This motion and the order thereon will be discussed later in this opinion.
After the verdict, the appellant filed a motion for new trial alleging certain facts which will be more fully stated hereafter. The State filed responses to such motion. The trial Judge proceeded to take testimony on the issues raised by the motion for new trial and the responses filed by the State, after which he entered an order denying the motion for a new trial. The Court then adjudged the appellant guilty of murder in the first degree and sentenced him to death in the electric chair. This appeal is from the judgment and sentence.
The appellant has propounded eight questions on the appeal. We shall not consider the questions as they are numbered in the briefs but shall consider them in what we believe to be a more logical order.
The first question for consideration is whether the trial court committed prejudicial error in excusing prospective jurors in advance of the trial from responding to their summons, where such action on the part of the court took place without the knowledge and consent of the defendant and his counsel and in their absence.
In respect to this question, it appears from the record that a jury venire of 150 names was drawn from the lot. Under the law as it existed at the time of this trial, Section 40.36, F.S.A., a regular venire consisted of such number of persons as the Judge should deem necessary or expedient for a jury venire. The appellant does not disclose whether this was a special or a regular venire, and hence we will assume that it was a regular venire.
The record shows that before the prospective jurors were examined on their voir dire, the attorney for the appellant announced to the Court that he would like to make a motion for the record; however, the record fails to show that he ever made any such motion. He did make the statement to the Court to the effect that the jury panel of 150 names had been reduced to 43, that many jurors had been excused in open court and that the Judge had excused some jurors before the case was called for trial in the absence of the defendant and without notice to him and without his consent and without requiring their excuses to be made under oath. Because of the gravity of the issues involved we will treat these proceedings as being an objection timely made to the action of the Court in excusing the jurors. In connection with this objection the trial Judge stated:
"The Court will say this: That in numbers of cases the party is absolutely unable to come to court to give his excuse. He would have to be brought in by ambulance and on a stretcher. There are some cases of that kind. The Court has always excused jurors who would give an absolutely valid excuse as to why he should not be required to serve just the same as he does in open court, and the Court will follow this practice unless and until it is held that it is error."
The trial Judge has a broad discretion in excusing prospective jurors for reasons personal to such persons. A defendant in a criminal case is not entitled to any particular juror or jury. Mathis v. State, 45 Fla. 46, 34 So. 287; Davis & Youngue v. State, 90 Fla. 322, 105 So. 845; 14 Am.Jur. 902, Criminal Law, Sec. 194; Maxwell v. State, 89 Ala. 150, 7 So. 824; Parker v. State, 201 Miss. 579, 29 So.2d 910.
The appellant places great reliance upon Sec. 914.01(3), F.S.A., which provides that in all prosecutions for a felony, the defendant shall be present:
"At the calling, examination, challenging, impaneling and swearing of the jury".
Excusing jurors is no part of the calling, examination, challenging, impaneling or swearing of the jury; therefore, it is not necessary that the defendant be present when prospective jurors are excused by the trial Judge.
Appellant relies upon the case of Adams v. State, 28 Fla. 511, 10 So. 106, 117, where this Court said:
"He has the right to be present and to hear questions of law as well as *80 questions of fact discussed, and in fact no steps can be taken in the case in his absence. The court must see in capital cases that the accused is present before any proceedings are taken in the case."
The record shows that after court was opened the appellant was present at all times to hear questions of law as well as questions of fact discussed and it is not made to appear that any step was taken in the case in the absence of the defendant. The case of Adams v. State, supra, is not susceptible of the construction placed upon it by the appellant. The language used by the Court in that opinion that "the court must see in capital cases that the accused is present before any proceedings are taken in the case" means in, or during, the trial of the case, and is not susceptible to a construction that the accused must be present when jurors' names are drawn from the box, or when the sheriff serves the prospective jurors, or when the trial Judge in the exercise of a broad and sound discretion excuses a juror for good and sufficient reasons determined by the trial Judge.
We hold that the appellant was not prejudiced by the trial Judge excusing jurors in his absence and the same did not constitute error.
The second question: Did the trial court commit prejudicial error in denying defendant's motion for a continuance and not granting, sua sponte, a change of venue, particularly, when the Tampa Morning Tribune, a newspaper that was available to prospective jurors, published a front page article on the morning of the second day of the trial proceedings, in which it falsely stated that the defendant was charged with poisoning the deceased and that the defendant had killed his first wife with a pump gun and was then under investigation for such homicide?
It appears from the record that on September 4, 1951 the examination of the jurors on their voir dire began and eleven jurors had been tentatively selected before the recess of the Court for the night. On the morning of September 5, 1951, the appellant filed a motion for a continuance. This motion was based upon an article which appeared in the Tampa Tribune on September 5, 1951, which, according to the motion, contained untrue and inflamatory statements about the appellant and about the case. The motion is lengthy and the article appearing in the Tampa Tribune on the date in question appears in the record. No purpose could be served by copying the same in this opinion.
The trial Judge made the following order on the motion for a continuance:
"Upon the said motion presented at this time for a continuance of this case until the next term of court on account of the fact of an article carried by the Tampa Tribune in the issue of September 5, 1951, the Court has considered said motion and has considered the facts appearing to the Court from said motion and from the trial of this case up to this time.
"The day was spent yesterday, September 4th, in qualifying and tentatively impaneling the jurors for the trial of the case with the result that at the close of the day eleven jurors had been tentatively placed in the box but the panel, of course, has not been closed and this motion is presented at the beginning of the trial on September 5th.
"At this time and upon consideration of said motion when it does not appear whether or not any of the prospective jurors or jurors tentatively in the box have read the said issue of the Tribune on September 5th, this date, and when the panel is still open for re-examination of each and every individual juror tentatively seated in the box at this time as well as for all prospective jurors summoned and subject to examination on voir dire as to their qualifications to serve in this case the Court feels that nothing would be gained by continuing the case to another day. Everything that has happened in this case at this time might happen just as well immediately before the convening of any jury at any time to try a case of this kind and if newspaper articles *81 published with regard to an approaching trial, or a trial in progress even, will result in each such case being continued the courts will be greatly handicapped in ever completing trials of important cases.
"In this case the Court will be extremely careful to extend every degree of the greatest fairness to this defendant in allowing counsel for the defendant to question every juror tentatively in the box as to, first, whether or not such juror has read the article of September 5th in the Tampa Tribune and, after that, if it appears that any juror does not qualify to the satisfaction of counsel for defendant with regard to any influence or any inerasable impression upon such juror made by this article of the Tribune, the Court will excuse such juror for cause from sitting in this case. Every juror tentatively in the box might possibly be excused for cause if it is shown that because of this article he might be influenced to the very least degree in making or bringing in a verdict in the case. The motion for continuance is denied."
The motion for a continuance did not charge that the newspaper article had been read by any of the eleven jurors tentatively selected or by any of the prospective jurors. There was no effort made by the appellant to prove that any of them had read the article. The trial Judge was extremely cautious and gave to the appellant full opportunity to examine every juror with reference to the newspaper article in question.
After the motion for a continuance was denied, one of the jurors tentatively selected, in reply to a question, said that he was biased and he was promptly excused. After another juror had been selected to take the place of the one excused, the State Attorney asked each of the jurors the following question: "In your frame of mind this morning, can you stand fairly and impartially as between the State of Florida and the defendant, if accepted upon this jury?" Each of the jurors stated that he could except one and he was promptly excused. Thereafter, the selection of the jury proceeded until twelve were accepted by both sides. At no time did the appellant take advantage of the opportunity offered to him by the trial Judge to interrogate any of the jurors about the newspaper article.
It should be noted that the question No. 2 propounded by the appellant complains about the Court denying his motion for a continuance and "in failing to order a change of venue, sua sponte".
Section 11 of the Declaration of Rights of the Constitution of Florida, F.S.A., gave the appellant the right to be tried in Polk County wherein it was alleged the crime was committed. The record fails to show that the appellant at any time moved for a change of venue, or consented to a change of venue. The record shows that 37 veniremen were examined on his voir dire before a jury of twelve was accepted by both sides.
The appellant was not prejudiced by the denial of the motion for a continuance and the same did not constitute error.
The third question advances the contention that the trial Court committed error in admitting in evidence, over defendant's objections, the clothes worn by the deceased at the time of death.
The appellant divides the above question into subdivisions as follows:
(a) The State failed to show that the clothes had been kept in proper custody since the death of the deceased.
(b) The clothes were not in the same condition at the time of the trial as they were at the time of death.
(c) The State showed no purpose for the introduction of the clothes in evidence.
(d) The clothes failed to shed any light on any material issue in the case.
As to subquestion (a), it is unnecessary to recite all of the testimony with reference to the custody of the clothes. We have carefully considered this testimony and it is sufficient to say that the custody of the clothes was accounted for from the time they were removed from the body of the deceased until they were delivered to a Deputy Sheriff and the Sheriff, and from *82 that time until they were produced in court at the time of the trial.
As to subquestion (b), the evidence offered by the State showed that the clothes remained in substantially the same condition they were in from the time they were taken from the body until produced in court.
Subquestions (c) and (d) will be considered together. The appellant urges that the clothes do not shed any light on any material issue in the case, and at the time the State offered the clothes in evidence, there was no showing as to what purpose the introduction of the clothes in evidence would serve.
The answer to the contention is that the clothes tended to show the size and weight of the deceased. There was evidence that appellant had stated that the deceased was a very large and heavy woman and after she became ill, he was afraid to move her by himself. The clothes were material in refuting this statement made by the appellant. Dr. Mills, who measured the deceased, found that she was only four and one-half feet long and he estimated her weight at 100 pounds. The clothes were in corroboration of that testimony and refute the alleged statement of appellant as to her size and weight. A further answer is that appellant claimed that the deceased died from a heart attack, hence, the bloodstains on the clothes and their location became material as throwing light upon the cause of death and in corroborating other testimony in the case relative to the cause of death. The appellant was not prejudiced by the admission of the clothes in evidence and it was not error to overrule the objection of the appellant.
The contention of the appellant that the Court committed error in permitting the clothes to go in evidence when the State Attorney did not state the specific purpose for which the clothes were offered in evidence is without merit. The record does not disclose that the appellant made any objection on that ground. The appellant is confined to the specific objections that he made in the trial court and other grounds of objection will not be considered on appeal. Markey v. State, 47 Fla. 38, 37 So. 53; Lewis v. State, 55 Fla. 54, 45 So. 998.
The appellant relies principally on the case of Deeb v. State, 131 Fla. 362, 179 So. 894, 901, in support of his contention that before bloody clothes can be received in evidence, the state is required in offering the exhibit to state the definite purpose for which the exhibit is offered in evidence. In that case, "it was specifically called to the attention of the court that no reason was given nor any purpose stated for the offer, and that the only reason could be that same were offered and displayed at length to prejudice the jury against the defendant." In the body of the opinion, the Court said:
"Counsel for the defendant below argues that no reason for the introduction of the clothes in evidence was given by the State, although it was specifically called to the attention of the court that no reason was given nor any purpose stated for the offer, and that the only reason could be that same were offered and displayed at length to prejudice the jury against the defendant.
"Proper practice required the State, before offering the clothes in evidence, to show to the court that specific items of clothes worn by the deceased at the time of the homicide were appropriate to illustrate or corroborate the testimony being then given by a witness, * * *."
The testimony of the witness Moody who helped take the clothes from the body of the deceased, of Arnold who first saw the clothes on the body right after the body was picked up and who also assisted in taking the clothes from the body, of Hamp Rogers, Deputy Sheriff, to whom Dan Moody gave the clothes, and of Sheriff Parrish to whom his deputy, Rogers, delivered the clothes, all testified at length in identifying the clothes and their condition. The testimony of Moody and Arnold, on cross-examination by the appellant, clearly made the reason and purpose appear for the identification of the clothes and for offering them *83 in evidence. Such testimony clearly informed the Court and the appellant of the specific items of clothes worn by the deceased at the time of death and that such clothes were "appropriate to illustrate or corroborate the testimony" of other witnesses.
From all of the testimony with reference to identification of the clothes it is perfectly apparent that the purpose was to use them to better illustrate and corroborate the oral testimony of many witnesses, and to refute statements allegedly made by appellant to various persons prior to the trial.
The fourth question we will consider is stated by the appellant as follows: Is the defendant entitled to a new trial, when, through no fault of his own, he did not receive a fair and impartial trial because one of the jurors was not a fair and impartial juror?
In his motion for a new trial the appellant alleged that prior to trial a juror by the name of Bloodworth had formed and expressed a fixed opinion that the appellant was guilty and that such juror had that fixed opinion when accepted upon the jury, but that upon voir dire examination he testified that he had never formed or expressed any opinion as to the appellant's guilt or innocence. The State traversed the allegations of the motion. The trial Judge held a hearing at which testimony was introduced for and against the allegations concerning Bloodworth. After having heard and considered the testimony, the trial Judge denied the motion. We do not find any error in this ruling. The trial Judge had all of the witnesses before him and was in a better position to pass upon the testimony concerning this matter and to determine the truth than anyone else. It is unnecessary for us to summarize or repeat the testimony which we have carefully examined. There were some conflicts in the testimony. Motives, beliefs, friendships, bias and prejudice of some of the various witnesses examined before the trial Judge were apparent. It was the duty of the Court to pass upon such matter. The order denying the motion settled conflicts in the testimony and was necessarily based upon findings of fact that the appellant had failed to prove his allegations with reference to Bloodworth.
The juror Bloodworth testified at this hearing before the trial Judge and his testimony becomes important in view of the case of Irvin v. State, 19 Fla. 872. Bloodworth testified that he didn't remember having expressed a fixed opinion as to the appellant's guilt or innocence before he was sworn as a juror in the case; that he had no fixed opinion that he could express; that he knew none of the facts of the case before he was sworn as a juror except general gossip and reading the newspapers; that when he was examined as a juror he was not conscious of ever having formed or expressed any opinion as to the guilt or innocence of the appellant; that at the time of such examination as a prospective juror he absolutely had a fair and impartial mind, that his mind was open when he took the oath and that he told the truth. He stated, "The State would have to prove to my knowledge before I would deem him guilty."
In the case of Irvin v. State, supra, a similar contention was made about a juror by the name of Coburn. In that case the motion was considered by the trial Judge based upon affidavits instead of the personal appearance of witnesses before the Judge. In that case this Court said:
"Aside from these considerations, Coburn, by his affidavit, sets the question at rest. He has no recollection of having used the expressions as charged in the several affidavits presented by the defendant on the motion. He says he had not informed himself of the circumstances of the killing, and that when he was sworn as a juror he had no existing or formed opinion as to the guilt or innocence of the accused, and was absolutely without any previously-formed opinion, and without bias or prejudice for or against the accused. He thus shows himself qualified as a juror when he was so sworn."
See also Lamb v. State, 90 Fla. 844, 107 So. 530; Crosby v. State, 90 Fla. 381, 106 So. 741.
The trial Court did not commit error in refusing to grant a new trial on the ground *84 that the appellant did not receive a fair and impartial trial because one of the jurors was not a fair and impartial juror.
The fifth question: Were not the substantial rights of the defendant to a fair and impartial trial violated by the conduct of the bailiff in permitting a religious evangelist to meet with the jury in secret session?
In the motion for a new trial the appellant alleged that on Sunday morning, September 9, 1951, and again on September 12, 1951, the bailiff brought a preacher to the jury who talked with all members of the jury and that such association by the jury with the preacher was highly irregular and prejudicial to the defendant.
The trial Judge took voluminous testimony with reference to these occurrences. It appeared that there had been some talk about going to church and the jurors couldn't agree as to what church to attend. One of the jurors knew of a preacher who had conducted services in a church which he had attended. It was at the suggestion of this juror and not at the suggestion of the bailiff that the preacher meet with them and grace the table. This he did on the two occasions above mentioned. He remained with the jurors approximately 3 minutes and 20 seconds the first time, and 3 minutes and 40 seconds the second time. The bailiff had a stop watch and timed him.
The preacher was eating breakfast in the same cafe where the jurors had their breakfast; Grigsby, one of the jurors was a Methodist and Preacher Jones was a Baptist. Grigsby had attended church only twice while Jones was preaching at revivals some time before this trial. He had never met Preacher Jones and did not have any personal contact with him before the trial, except a casual conversation about politics at some motor court. The room in the restaurant where the jurors ate was closed and this is the room where the preacher was in contact with the jurors as above indicated. The bailiff was present at all times. The testimony is clear that the preacher did not mention to the jurors anything concerning the case or refer to it directly or indirectly. He confined his activities to reading from the Bible and gracing the table with prayer. At the hearing before the trial Judge it appears that all jurors were in agreement that the preacher read from the Book of Psalms. One juror testified that on Sunday, the first time the preacher was with them, he read a verse from Proverbs, but was unable to recall what the verse was about; on the second occasion he read from the Thirty-seventh Psalm and apparently stressed the 5th verse, which reads as follows:
"Commit thy way unto the Lord; trust also in him; and he shall bring it to pass."
The preacher didn't say anything about a juror and the word "juror" wasn't mentioned. One Juror testified that the preacher prayed, "God, give these men your divine guidance in their duties," and still another testified that the preacher asked for "divine guidance". It, therefore, appears that the nearest approach to any mention of the jurors was the testimony of one juror that the preacher prayed "God, give these men your divine guidance in their duties," and another juror who testified the preacher asked for "divine guidance". The jurors were unanimous in testifying that what the preacher said and read did not affect their verdict.
It was the duty of the trial Judge to reconcile any conflict or apparent conflict in the testimony before him with reference to this matter. It is apparent from the testimony that the trial Judge in the presence of defense counsel and without any objection authorized the bailiff to take the jurors to church; the jurors couldn't agree on which church to attend, and at the suggestion of one or more of the jurors, and not the bailiff, the preacher was called in to grace the table on two occasions before the case went to the jury. The trial Judge was justified from the evidence in finding as a fact that the preacher did not mention the case or the jurors, or discuss the duties of the jurors and that nothing was said or done which could have prejudiced the appellant or had any effect upon the verdict of the jury.
*85 The appellant cites and quotes from the case of Shaw v. State, 83 Ga. 92, 9 S.E. 768, 769. In that case the bailiff was ordered by the Court to keep the jury in the jury room. Instead of obeying the Court's order, the bailiff took the jurors to a prayer meeting conducted by a preacher who was an active prosecutor in the case and who helped select the jury, and even testified before the jury. At the prayer meeting the preacher conducted the jurors to their seats and addressed them; he prayed that the officers of the Court then in church might be guided a-right in the discharge of their duties.
In the case of Shaw v. State, supra, the Court recognized that where misconduct of the jury is shown, the State may show that no prejudice resulted. The case was not reversed simply because the jury went to a prayer meeting but because of the influences the jury were subjected to at the prayer meeting by a preacher who was a prosecuting witness, who helped select the jury, and who was personally interested in the case. In the course of its opinion, the Georgia Court said:
"Here was a defendant on trial for his life. This jury had been selected to pass upon that issue. The bailiff had been sworn to keep them separate and apart from their fellow-citizens. In violation of this oath, without permission of the judge, he took them from their room, where he had sworn to keep them, to a prayer-meeting conducted by the prosecutor in the case. When they arrived there, they were shown to their seats by the prosecutor, who provided for them a place apart from the remainder of the congregation, and who led the services and addressed the congregation. Prayers were offered for the court and its officers. How long they remained there does not appear. For aught that appears in the record, the house may have been crowded. One of the grounds of the motion alleges that there was `shouting' at the meeting. What influence this shouting and religious excitement may have had upon the minds of the jury does not appear. It does not appear that Mr. Hooten, the prosecutor, was not among those who shouted. The jury seeing this going on, and seeing this prosecutor filled with religious zeal and fervor, may have reasoned in their minds, and doubtless did, that this man who was the active prosecutor of the defendant, who assisted in the selection of themselves as jurors in the case, and who testified before them as witness, by his conduct and declarations at the prayer-meeting showed that he was a good and upright man, and that such a man would not prosecute the defendant unless he believed him to be guilty. Some of them were perhaps members of his congregation, and looked up to him as their pastor and spiritual guide. We do not say, nor do we intend to intimate, that Mr. Hooten designedly intended his actions to have an undue influence upon the jury, but who can say that they did not have this effect?"
We have no such state of facts in the case at bar. In the case now before us the jurors had permission from the Court to attend church; they could not agree upon what church to attend; one of the jurors with the acquiescence of the others had the bailiff get a preacher to come into the room where they were eating to grace the table. This preacher was not a witness for the State; he did not help select the jury; he was not an active prosecutor. He was not the pastor of any of the jurors and was known to only one juror, who had one casual conversation with him about politics and had only heard him preach on two occasions.
An examination of the other cases cited and relied upon by the appellant, including, Owens v. State, 68 Fla. 154, 67 So. 39; Seekers v. State, 253 Ala. 420, 44 So.2d 633; White v. State, 129 Fla. 885, 176 So. 842, reveals that they are not in point. The case of State ex rel. Larkins v. Lewis, Fla., 54 So.2d 199, 200, is emphasized by appellant. In that case the accused was being tried for first-degree murder. After the testimony had been completed and the case submitted to the jury and while the jurors were still deliberating in the jury room, the Court *86 was informed that certain parties were attempting to tamper with or communicate with members of the jury by the medium of signals or signs outside the court house, but within plain view of the jury through an open window. The trial Judge immediately went to the window there he could see what was taking place; he was satisfied that something wrong was going on; he called the jury before him, gave them appropriate instructions and ordered them in charge of the bailiff:
"The court then had brought before him the persons charged with attempting to communicate with the jury including others who were witnesses to their conduct, and examined them thoroughly. The evidence developed that C.D. Musgrove and Dudolph Rackley were in an automobile of a third party outside the court house in full view of the jury through a window, that they were making signs and signals in the direction of the window into the jury room, that one of them would motion with hands in different positions in the direction of the jury room, that he would then place his hands in his rear pocket, stare into the jury room and make contortions with his face. He would then look from the back seat of the car with his hand and five fingers extended toward the jury. It is not shown how long this performance was carried on or whether an attempt was being made to influence the jury for an acquittal or a conviction. Other and similar performance was carried on but we do not detail it here."
Counsel for the State and the defendant were present and were fully advised as to the investigation by the Court. The Court concluded that the circumstances were highly suspicious and counsel for the State and defendant agreed with him. The trial Judge found that the circumstances revealed by his investigation made a manifest, urgent and absolute necessity for him to declare a mistrial. In that case the Court further said:
"* * * Whether or not the jury or any of them had been influenced by what took place outside the court room, no one could tell, but it is certain that they had been subjected to outside influence. * * *"
It is perfectly apparent that the purpose and intent of the parties outside the court house making signs and signals was to influence the jury. It is certain that the jury had been subjected to an outside influence  whether for or against the accused, no one could tell.
In the case at bar there was no evidence of any kind that the preacher attempted to influence the jury or that any member of the jury was subjected to any influence by this preacher. See our recent case of Moseley v. State, Fla., 60 So.2d 167.
While we do not approve of jurors or bailiffs or anyone else inviting preachers or other outsiders into a jury room and such practice is irregular and cannot be too severely condemned, we do not find in this case that the appearance of the preacher on two occasions as shown by this record in any way influenced the jury in their deliberations or affected the verdict returned by them.
After all briefs were in, the appellant filed an Amendment to the Brief in which he raised the additional question, which we shall designate as the sixth question: Is not the appellant entitled to a new trial because the assistant state attorney charged the appellant's counsel was guilty of trickery of a state witness and the trial court did not sufficiently rebuke the prosecutor?
In the course of the trial on redirect examination by the Assistant State Attorney of one William Arnold, a state witness, the following question was asked and answer given:
"Q. When he came out to see you there, to talk to you, he brought a man along to take down every word that you said so that he could trick you on the stand up here, didn't he? A. Yes sir."
Objection was made and the Court asked to instruct the jury to disregard the objectionable question. The Court then said:
"Gentlemen of the jury, any remark or suggestion that Mr. Parkhill was *87 trying to trick the witness in any way is improper and you will pay no attention whatsoever to it. Pay no attention whatsoever to it. Disregard it absolutely. Forget all about it."
Then the following proceedings took place:
"Mr. Love: I meant nothing personal about the practice of carrying along a reporter. You know that, John."
"Mr. Love: If the Court please, I would like to say this: In making my remarks during the examination of the last witness, I intended to cast no reflection upon John Parkhill. I have known him for many years and he's, he's all right, your Honor."
After these proceedings took place, there was no further objection on the part of the appellant or his counsel and no request or motion for mistrial was made because of this incident. It was not mentioned in the motion for new trial or in the grounds of appeal. The statements made by Mr. Love were a complete retraction and apology and as shown by this record was not prejudicial and did not constitute reversible error.
The seventh question: Did the trial court commit reversible error in permitting an expert witness, over defendant's objections to testify that in his opinion the bruises and contusions upon the deceased were caused by an assault, principally by blunt force, and that the method of assault was most consistent with strangulation?
Dr. Mills performed the autopsy on the body of Mrs. Albritton; he observed and testified as to the number of wounds and the nature and distribution of the wounds on the body. Dr. Mills qualified as a specialist by education, knowledge, experience and training in pathology. Since his graduation from medical college in 1910 he had had several special courses in pathology, the last course he took being at Cornell University in 1948, and he had specialized in that field for 41 years; he belonged to all the societies of organized medicine, such as, the Hillsborough County Medical Association, Florida State Medical Association, American Medical Association and also a Fellow of the American Society of Clinical Pathologists; he was certified by the American Board of Pathology and was a founding member of the American Pathologists.
After testifying in great detail as to the bruises and contusions on the throat and body, Dr. Mills was asked the following question: "Did you form an opinion from the bruises and contusions upon her throat and in her throat as to how  what caused such bruises and contusions." The appellant objected to this question on the grounds: first, that the question called for an opinion of fact and not a mere medical opinion; second, the question goes beyond the field of medical expert witness and invades the province of the jury; and third, because the doctor had already testified as to the objective findings of his autopsy. The Court overruled the objections of the appellant and Dr. Mills answered the question as follows:
"Because of the multiplicity, nature and distribution of various wounds on this body, I concluded that they were most consistent with the person having been assaulted, principally by blunt force, and that the method of assault is most consistent with strangulation."
This question did not call for an answer from Dr. Mills as to whether or not there was a felonious assault or who made the assault. The question simply called for an opinion from this expert witness as to what caused the bruises and contusions upon and in the throat of the deceased. He was qualified to express an opinion. Although the jury was not bound by his opinion, they were entitled to the benefit of that opinion to aid them in the performance of their duties. In 23 C.J.S. 83, Criminal Law, § 868, the author states:
"The opinion of an expert witness, particularly a physician, as to the possible and probable cause of a wound or injury, the manner of its infliction, and the kind of weapon or instrument used, is admissible. Even though he has had no practical experience and his knowledge is derived alone from the study of books, a physician may be *88 qualified to testify as an expert in respect of gunshot wounds. A physician who examined the body of a wounded or injured person may testify as to the location and character of the wound or injury, the direction and course of a bullet in or through the body, and the probable cause of the wound or injury."
See also 20 Am.Jur. 730, Sec. 867; 26 Am. Jur. 458, Sec. 437; Annotation in 136 A.L.R. 966 and 985; 20 Am.Jur. 654, Sec. 782; Miller v. State, 9 Okla. Cr. 255, 131 P. 717; State v. Heinz, 223 Iowa 1241, 275 N.W. 10. The law with reference to this question is well stated in 20 Am.Jur. 654, in the article on Evidence, Sec. 782, as follows:
"It is certainly contrary to the unmistakable trend of authority to exclude expert opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to expert opinion. The courts consider that it is more important to get to the truth of the matter than to quibble over distinctions in this regard which are in many cases impracticable."
The trial Court did not commit prejudicial or reversible error in overruling the objections of the appellant to the question propounded or the answer as given to such question.
The eighth question: The evidence being entirely circumstantial in character, was it not legally insufficient to support a verdict of guilty?
The appellant has divided this question into two subdivisions: (a) Appellant claims the evidence was insufficient to show the cause of death, and (b) the evidence failed to exclude every reasonable hypothesis except that of guilt.
(a) The appellant claims that because the state offered no direct and positive evidence as to the cause of death; because the state failed to prove that the defendant ever "so much as laid his little finger on the deceased" and did not charge and offer proof that the defendant attacked the deceased with a deadly weapon, the evidence was insufficient to show the cause of death.
It is true that no one saw the appellant attack the deceased, either with a deadly weapon, or with his hands. Testimony as to the condition of the body was evidence; the report of Dr. Mills who performed the autopsy was given in full to the jury as a joint exhibit of the appellee and the appellant. The report of Dr. Mills and his testimony disclosed in detail the injuries which he found on the face, the mouth, the neck, the head, chest, hands, arms, shoulders, thighs, legs and back and particularly the injuries inside the throat.
Dr. Mills testified that there was a large bruise on her neck about the size of two fingers and nearly as long on the right side and on the left side there was a smaller bruise about the size of a quarter; around the bruises found on the neck and the face and the right ear, there were found small scratches and abrasions. He found a bruise "way back in her throat about the size of a fingernail. It was right behind this organ here you call the voice-box  the Adam's apple  right behind that." Behind that back in the back of the throat he found a bruise on the left side about the same level as a bruise upon the exterior of her face; the left tonsil was bruised; he testified that the bruise in the throat was deep below the tonsil; he attributed the deep bruise to the pressure on the hard voice box, the Adam's apple, pushing it back against the backbone and pinching some soft tissue causing those deep bruises. He found there were two deep bruises on the left side, the lower one in the lower part of the throat and the upper one involving the left tonsil.
Dr. Mills also testified that he found definite evidence of heart disease. The heart disease was not bad but marked and the heart was enlarged. He found the walls of her heart were increased in thickness.
After giving this detailed testimony of the conditions which he found, Dr. Mills testified that the wounds on the deceased's neck and throat, both superficial and deep, *89 was the cause of death. He expressed the opinion that a contributory cause of death was her heart condition which was augmented and accelerated by the principal cause of death which was the wounds on the throat. Dr. Mills testified the heart condition was not an advanced one and that people with such a condition usually live several years. He did testify that if such people are subjected to extreme excitement or any fatiguing experience, the heart condition might become augmented and accelerated and that such a person should not be subjected to violence or any fatiguing experience.
We have carefully reviewed all of the testimony offered by the appellee and the appellant touching upon the question of the cause of death. Any and all conflicts in this evidence were questions for the jury to settle. The evidence as to the cause of death was legally sufficient and the assignment of error on this question is without merit.
(b) The appellant strongly contends that the evidence failed to exclude every reasonable hypothesis except that of guilt.
No one but the appellant was present when Mrs. Albritton died. He made many statements to other people, but did not testify. There is no direct testimony by anyone who saw what happened immediately preceding, at the time of, or immediately after Mrs. Albritton's death. For a conviction, the State relied upon circumstantial evidence. In order to pass upon this question it is necessary that we summarize as briefly as we may facts and circumstances upon which the State relied for a conviction.
Ira W. Albritton was the husband of Betty Albritton, deceased. He died on January 7, 1951. Prior to that time appellant and Ira Albritton bought and sold some cattle together. The relationship between the parties was such that the appellant was appointed administrator of the estate of Ira W. Albritton. On January 11, 1951, four days after the death of Ira W. Albritton, Mrs. Albritton executed a will in which she devised and bequeathed to the appellant all of her property and appointed him as executor. The will contained the following:
"Two. I give, devise and bequeath to A.E. North, all of my property, both real and personal, of every class and distinction whatsoever.
"It is my desire that upon my death that A.E. North should be appointed as guardian of my son, Henry Albritton, and that the said A.E. North should at all times look after the welfare of my said son.
* * * * * *
"Four. I hereby nominate and appoint the said A.E. North as Executor of this, my Last Will and Testament, hereby giving and granting him the right, power and authority to sell and convey any part or all of my estate, whether real or personal, and to make good and sufficient conveyances to any purchaser thereof."
Mrs. Albritton had a son by the name of Henry who was mentally subnormal. She left nothing to this son. The welfare and financial interest of the son was left entirely at the mercy of the appellant.
It is important to note the activities of the appellant with reference to the execution of this will. Prior to the execution of the will, he went to Grady Burton, a lawyer, and told him that Mrs. Albritton wished to have a will drawn and wanted the appellant named as the beneficiary and guardian of her son. Burton would not draw the will upon the representations of the appellant but told him that he would prefer discussing the matter with Mrs. Albritton. A day or two thereafter Mrs. Albritton appeared in Burton's office with the appellant. Burton talked to her privately and ascertained that she wished to leave all of her property to the appellant and to name the appellant as guardian for her mentally subnormal son. Burton prepared the will according to instructions and Mrs. Albritton then came back with the appellant and executed the will.
In February, 1951, the appellant told one Lee Draper that he had been named as administrator (meaning executor of will) of Mrs. Albritton's estate and at her death was *90 to inherit the estate. He also told Draper that Mrs. Albritton's health was not good and that she had had several attacks.
About six weeks before Mrs. Albritton's death she told James Hobbs in the presence of the appellant that she had made a will and that at her death, the appellant would get everything she had and that he would take care of Hobbs and her son, Henry. Two days after the death of Mrs. Albritton on June 28, 1951, the appellant told Deputy Sheriff Rogers that he had seen Mrs. Albritton's will.
The activities of the appellant concerning the will of Mrs. Albritton, his knowledge of its contents and his discussion of the same with others is significant because he told Deputy Sheriff Rogers that he did not benefit by the will but only acted as a "trustee or something," and that everything was willed to Henry Albritton. This statement was made on Thursday night after the death of Mrs. Albritton on Tuesday. About a month before Mrs. Albritton's death, the testimony shows that appellant told James Hobbs, "If Mrs. Albritton was out of the way he wouldn't have no more worries."
The record shows that an inventory was made of the Albritton cattle two or three weeks after Mrs. Albritton's death. There was something like 475 head of cattle in various places and they had a total value in excess of $50,000.
The appellant contends that there was not the slightest motive or incentive for the appellant to commit murder. In the appellant's brief he states, "If he had been financially embarrassed, we readily agree the existence of the will would have furnished motive." It is not always true that people seek financial gain or to acquire more of this world's goods because of financial embarrassment. The desire to possess, acquire and increase one's financial standing is a fundamental characteristic of human nature. Greed and selfishness, throughout recorded history, have caused men to continue to seek wealth. Thousands of cases could be cited where men have continued to seek and acquire money, property and wealth after every financial need has been satisfied, and all financial embarrassment eliminated. In a case like this it was not necessary to show financial embarrassment in order for the jury to believe from the evidence that the existence of this will constituted a motive. The jury was the sole judge of whether or not there was a motive and from this record they were entitled to believe that there was a motive.
We now come to the fatal night of June 25, 1951, and the morning of June 26, 1951. Mrs. Albritton was at her home, about ten miles East of Fort Meade, and about 7:30 that night Mrs. Hugh Rhoden went to Mrs. Albritton's home. Mrs. Albritton prepared supper consisting of sausage, rice, gravy, cold macaroni and cheese, and hot biscuits. They ate and after supper Mrs. Albritton washed the dishes and Mrs. Rhoden dried them. Mrs. Rhoden and family left about 9:30. On this occasion between 7:30 and 9:30 Mrs. Albritton looked natural and there was nothing unusual about her appearance according to the testimony of Mrs. Rhoden and James Hobbs, a Negro man who stayed on the Albritton place.
Before Mrs. Rhoden left, the appellant appeared on the scene. Mrs. Albritton followed Mrs. Rhoden to the automobile and talked with her some. She then returned to the house and sat on the porch with the appellant, her son Henry, and James Hobbs. About this time the appellant asked them if they wanted a coca cola, which they all did. The appellant and Henry Albritton went to the car together and Henry carried in two coca colas, keeping one and giving one to Mrs. Albritton. Henry also carried a piece of candy which he ate. The appellant brought in a coca cola for himself and one for James Hobbs and also a piece of candy which he gave to Mrs. Albritton. She ate part of the candy and drank a part of the coca cola.
After drinking the coca colas and eating of the candy, the appellant stated he had to go to Fort Meade to see a man and asked them to go with him. They all got in appellant's automobile and went to Fort Meade and stopped at a filling station. Mrs. Albritton became sick and on the way *91 back asked appellant to stop because she had to "throw up" and stated that the piece of candy had made her sick. She got out of the car with the help of the appellant holding her under the armpits and dropped to her knees and vomited. James Hobbs then helped her back in the car and further down the road, she opened the door, held her head out and vomited again. Hobbs asked if she wished to have a doctor and she said, "No", that she wanted to go home. When she got home, appellant helped her onto the porch by holding her under the armpits. She then walked toward the back porch, turned around and came back to the front porch and sat in a rocking chair.
After Mrs. Albritton sat down in the rocking chair on the porch, the appellant asked her if she wanted a doctor, and she answered, "No." She continued to sit there and heave occasionally. Henry asked her if she wanted him to get Miss Minnie Arnold, who lived close by and who occasionally did some kind of "doctoring." She said she did not. James Hobbs asked about getting Lovie Rhoden and her husband. She told him not to get anybody. Later on Henry asked her if she wanted him to go and get a doctor and she told him that he had better go and get somebody. James Hobbs went out the gate and said he was going to get somebody. The appellant told him to take the jeep and go to Fort Meade and get the appellant's ambulance. He told Hobbs to tell Arnold, one of his helpers at the undertaking place, to bring the ambulance and get Mrs. Albritton and take her to the hospital. He sent Henry off with James Hobbs and told them they needn't drive fast. They left between 11:00 and 11:30. The appellant's Oldsmobile was there. He did not use it to take Mrs. Albritton to a doctor. He sent James Hobbs and Henry Albritton in a jeep with instructions not to drive fast and to bring back an ambulance. After they left, no one was present but the appellant and Mrs. Albritton. James and Henry went to the funeral home, got the ambulance, and with Arnold returned to the Albritton home. Mrs. Albritton was dead when they got there, and testimony is that at that time the appellant said, "She just had a hemorrhage and fell over dead." He said that James and Henry had not gotten out of sight when she died.
The testimony shows that a cot was carried in from the ambulance and the appellant got a sheet and threw it over Mrs. Albritton. She was lying on the porch. James Hobbs saw her face  it was bloody. Arnold, the appellant's helper, raised the cover from her face and saw that it was dark and discolored. They put her on the cot and carried her to the ambulance. Arnold, the appellant's helper, asked him if he was doing right in moving the body without calling a doctor. He told Arnold they would call one later and instructed Arnold not to do any calling until the appellant got to the funeral home. No doctor was ever called and no death certificate was ever turned in, or filed.
Henry Albritton went on the ambulance to the funeral home and the appellant kept James Hobbs with him. They scrubbed up the blood by lantern light and then appellant and James went to Fort Meade.
When Arnold got to the funeral home, he and Dan Moody, who was also a helper of the appellant, carried the body into the morgue and placed it on a table. They took the clothes off and began to wash the body. Moody and Arnold described in considerable detail the bruises they found on the body and the blood which they found on the face from below the eyes down and on the throat and hands. Before the washing of the body was completed, appellant appeared on the scene. The testimony shows that at this time there was a scratch or small cut on the back of appellant's right hand up above the knuckles which was fresh and looked like he had skinned it. There was a broken fingernail on the deceased. On Thursday night when Deputy Sheriff Rogers talked to the appellant, he saw several scratches on appellant's hands between his knuckles and some were above the knuckles.
The testimony shows that it was customary to prepare funeral notices at this particular funeral parlor and that Moody helped prepare them. He asked appellant if he wanted him to go ahead and start *92 writing up the funeral notices for Mrs. Albritton. The appellant told him to wait a while "I don't know whether there will be one or not."
The testimony shows that the appellant had never before instructed Moody not to prepare a death notice.
After Mrs. Albritton's face was washed, the instruments were laid out and Arnold started to make an incision. According to the testimony, the appellant said, "Wait, I will do that. If I go in there, I know what I got. If somebody else goes in there, I don't know." Thereafter the appellant made the incision and went ahead with the embalming and set the features. Before he left the funeral parlor about 3:00 A.M., he placed a pack on Mrs. Albritton's face, the purpose being to bleach out the bruised areas.
The next day Arnold and Moody finished the embalming. They tro-carred her stomach at the direction of the appellant. The testimony shows that the purpose of tro-carring is to empty the organs of blood that can't be gotten out through drainage.
The testimony of Arnold was that after the embalming was finished the appellant said, "Wait until Katie and Minnie find out about this.  They'll ask a lot of questions, but as far as we know, she died of a heart attack." At the scene of death the appellant told Arnold, "She just had a hemorhage and fell over dead."
In the further effort to remove the bruises on the face, the appellant had Arnold apply wax to them, and promised to pay Arnold $5 extra if he would make her look good and please the family. At least two or three times the accused went in where Arnold was working and told him to pay particular attention to the left eye and see that it looked good. After the body was placed in the casket, Arnold called the appellant's attention to the bruise on the back of the left hand. The appellant told Arnold to put some white gloves on deceased's hands.
One Morgan Albritton asked the appellant how Mrs. Albritton took sick and died, and the appellant replied, "damn quick." On the day of the burial, Morgan Albritton asked the appellant if he had a doctor to Mrs. Albritton and he replied that there was no need of a doctor, that she was dead, and that she died of a heart attack. Morgan Albritton asked about the body looking so bad and the appellant replied, "I thought so much of the woman I couldn't do the work myself." On Thursday night he told Deputy Sheriff Rogers that he personally did the embalming because, "I thought so much of the old lady I just wanted to see that it was a good job done on it."
The appellant was in charge of the funeral. The testimony shows that it was the custom among rural people to bury the body with the feet toward the east. The casket was first placed with Mrs. Albritton's feet toward the west with the casket cover raised over to the south side. In viewing the body those present passed on the north side of the casket. Just before the casket was lowered into the grave, the position was reversed so that Mrs. Albritton's feet were turned toward the east. The jury was justified, after hearing this testimony, in believing that appellant had the casket switched around so that the light would not fall upon deceased's face in such a way as to show up the bruises thereon.
Prior to putting the coffin in the hearse to go to the cemetery, Arnold, the appellant's helper, told appellant he had forgotten to seal the casket. The appellant answered, "Well, that's all right. That's all right." According to the testimony the casket was never sealed. The vault was not sealed and appellant told the grave digger, Harrison, that he did not seal it because the deceased requested him not to, and stated to him that it was Mrs. Albritton's request that it not be sealed. On Thursday night, June 28, 1951, the appellant told Deputy Sheriff Rogers that he had buried Mrs. Albritton according to her request which had been made at the same time that Ira W. Albritton had made his request, that they wanted to be buried in the same manner and that was the way he had handled it. However, the testimony shows that Mr. Albritton's vault was sealed.
*93 The day after the funeral the appellant took James Hobbs and Henry Albritton to Hardee County where most of the Albritton cattle were and "cow hunted."
After the return from Hardee County, James Hobbs and Henry Albritton went to Lantana. On their way back they met the appellant who called James Hobbs off to one side and asked him if he had "two square pointed shovels and a nail bar." James told him he didn't and asked him what he wanted them for. According to James' testimony, the appellant said he wanted to dig up that body "so when the law dig it up they won't find it there." The appellant told James Hobbs he would meet him at the house around 11:00 o'clock. James reported this to Willard Houze and J.R. Collins. Houze called Willard Williamson, the jailer, and Williamson came to see Hobbs and Hobbs told him the same story. The testimony was that the appellant did go back to see James Hobbs at about 11:00 or 11:30 that night but did not mention anything about digging up the body. In the meantime the testimony shows that about 8:15 on that Thursday night, State Attorney Woolfolk with Deputy Sheriff Rogers and Investigator Keen went to see the appellant and talked to him at length about the death of Mrs. Albritton. The appellant strongly urges that this testimony about digging up the body is incredible and not entitled to belief. The jury was the sole judge of the credibility of the witnesses and was entitled to believe this testimony, and as reasonable men, to draw such conclusions and inferences from it, together with the visit from the State Attorney, deputy sheriff and investigator, as they saw fit.
The testimony shows that after officers began making an investigation and asking questions, the appellant, on Thursday night, between 11:00 and 11:30, went to the Albritton place and told James Hobbs and Henry Albritton not to tell anybody about having eaten any candy or drinking cold drinks or going anywhere the night of Mrs. Albritton's death, and on the same night he told Deputy Sheriff Rogers, "There was no food or drink taken so far as I know by anyone in the party after the Rhodens left."
The testimony shows that on the night they went to Fort Meade the party only stopped at a filling station, but the appellant told Deputy Sheriff Rogers after the investigation began, that they went straight to the funeral home in Fort Meade and picked up some burial permits. At the same time the appellant told Rogers that Mrs. Albritton became ill after he returned to the house, when the testimony was that she became ill at the filling station and vomited twice on the way home.
The testimony showed that the appellant made different, conflicting and inconsistent statements about how Mrs. Albritton died and about other material matters. According to the testimony, he told Arnold, "She just had a hemorrhage and fell over dead." He told James Hobbs, "She died with a hemorrhage and before she died she grabbed in her chest." Later, he told Arnold, his helper, that "she cut her lip when she fell out of the chair." At the funeral parlor he told Arnold, "She died of a heart attack." He told Morgan Albritton that she died "damn quick". He told Deputy Sheriff Smith on Thursday that she died of "a heart attack; that after he sent for the ambulance she became worse, complained of a headache and a pain in her chest; that he went to get a wet cloth to wash her face with and that while he was over there, she fell out of the chair and hit her face on the floor and was dead when he went back over to her." On Thursday night he told Deputy Sheriff Rogers, "She just grabbed herself and slumped over and died," and "That she fell out of the chair and struck a chair setting in front of her and cut her face and cut her upper lip."
On Friday after the funeral, the appellant asked Arnold if anybody had been there. Arnold said, "No," and the appellant then told Arnold that Morgan Albritton was trying to stir up trouble. He again asked Arnold if anybody had been there and Arnold told him, "No," and he then said, "Well, if they do, don't tell them anything."
The appellant attacks the credibility of many of the State's witnesses and claims that some of the testimony was so incredible that it was not entitled to belief *94 and that other testimony was prompted by jealousy, bias and prejudice. It was the sole province of the jury to settle any conflicts in the testimony and to pass upon the credibility of witnesses. To say the least, the testimony of Hobbs, Arnold and Deputy Sheriff Rogers was uncontradicted.
We have gone at great length to summarize what appears to us to be the material facts and circumstances shown by the testimony in this case. We will not further lengthen this opinion.
The law cited and quoted by the appellant with reference to conviction of murder in the first degree on circumstantial evidence is correct. It is unnecessary to repeat these citations and quotations. Such testimony must be of a conclusive nature and tendency, leading, on the whole, to a reasonable and moral certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a mere strong probability of guilt, but they must be consistent with guilt and inconsistent with innocence.
The jury had the right to conclude that every fact and every circumstance developed by the testimony in the case was consistent with guilt and inconsistent with innocence. The facts point and lead to only one conclusion and that is guilt. In a case of this magnitude and with so many witnesses and requiring so long for a trial, it is natural that some irregularities or harmless errors will occur. This is the reason why the Legislature adopted the Harmless Error Statute, Section 54.23, F.S.A. It is our opinion, after an examination and study of all the testimony and of the entire record, that no alleged error complained of has resulted in a miscarriage of justice.
The attorneys for the appellant in this case have lived up to the highest ideals and traditions of the profession, and have ably and diligently represented the appellant. They have performed their full duty in seeing that the appellant had a fair and impartial trial.
This record discloses that an able Circuit Judge was extremely careful and cautious in giving the appellant every opportunity to protect his rights and to see that he had a fair and impartial trial.
We have examined and considered the record in this case in the light of briefs filed and have also, pursuant to subparagraph (2) of Section 924.32, Florida Statutes, F.S.A., reviewed the evidence to determine if the interests of justice require a new trial, with the result that we find no reversible error is made to appear and the evidence does not reveal that the ends of justice require a new trial to be awarded.
Affirmed.
SEBRING, C.J., and THOMAS, HOBSON and ROBERTS, JJ., concur.
TERRELL, J., dissents.
DREW, J., not participating.

On Petition for Rehearing
MATHEWS, Justice.
The questions of the applicability of the harmless error rule or statute, with reference to a verdict of guilty of murder in the first degree without recommendation for mercy and bottomed entirely on circumstantial evidence, have been settled in this State since the year 1881, in the cases of Metzger v. The State, 18 Fla. 481, and Olive v. The State of Florida, 34 Fla. 203, 15 So. 925, 927. In the latter case the Court said:
"* * * The jurors were challenged by the state for cause, and excused by the court. They state positively that they would not find a man guilty on circumstantial evidence alone, in cases where the penalty was death. The statute (section 2850, Rev.St. [F.S.A. § 932.20]) provides that `no person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be allowed to serve as a juror on the trial of any capital case.' The death penalty can be inflicted in cases of conviction on proper circumstantial evidence as well as on direct testimony, and a juror who would not *95 find a verdict of guilt in such cases is excluded by the statute from serving as a juror on the trial of any capital case. Metzger v. State, 18 Fla. 481. * * *"
Section 932.20, F.S.A., provides:
"No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be allowed to serve as a juror on the trial of any capital case."
Section 924.33, F.S.A., provides:
"No judgment shall be reversed unless the appellate court after an examination of all the appeal papers is of the opinion that error was committed which injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant."
We have heretofore fully complied with Section 924.32, F.S.A., and have determined that "the interests of justice [does not] require a new trial." If, at this late date, after many persons have paid the extreme penalty, under these applicable provisions of the statute, the law is now to be changed to mean that the harmless error statute should not apply in a first-degree murder case where the verdict is one of guilty, without recommendation for mercy, and when such conviction is bottomed upon circumstantial evidence, then the Legislature should change the law and not this Court.
After the jury returned a verdict for murder in the first degree, without recommendation for mercy, a motion for new trial was filed September 21, 1952. Among the grounds for the motion for new trial were that the jurors, W.E. Moon, Thomas P. Bloodworth, Robert E. Gibson, and Charles J. Hickey, each on his voir dire examination stated that he had never formed or expressed an opinion about the guilt or innocence of the defendant, and that each of the said jurors had in fact formed and expressed a fixed opinion prior to the trial that the defendant was guilty. At the conclusion of the hearing on the motion for new trial, the appellant, through his attorney, stated, "We are abandoning paragraphs 23 [about Juror Robert E. Gibson] and 24 [about Juror Charles J. Hickey]." The testimony about Moon, heard by the trial Judge, was principally from a woman. The testimony showed she was drunk at the time of the alleged conversation with the juror and that she was constantly under the treatment of a psychiatrist, and her memory as to dates, times and conversation was faulty. The juror Moon denied her statements. There was no assignments of error based upon the ruling of the trial Judge with reference to the juror Moon and no argument in the briefs or at the bar of the Court. This left only the assignment of error with reference to the juror Bloodworth.
In the petition for rehearing the alleged error with reference to the juror Bloodworth is re-emphasized and it is claimed that the Court overlooked the materiality of the examination of the juror Bloodworth on his voir dire and the testimony taken before the trial Judge at the hearing on the motion for a new trial. We did not overlook anything in the record or the briefs in connection with the juror Bloodworth.
In the petition for rehearing the appellant cites the case of White v. State, 129 Fla. 885, 176 So. 842. This case was cited by the appellant in the original brief and was considered by the Court. In that case one of the jurors was the client of one of the attorneys in the case. This fact was concealed from the Court and the other attorney on the voir dire examination. Later, this attorney and his former client discussed the former relationship. There was no dispute about the facts. This Court discussed the confidential relationship of attorney and client and held that in view of the concealment of that confidential relationship, the discussion between attorney and client during the trial of the case was improper and constituted reversible error. We have no such situation in the case at bar.
After the verdict had been rendered and the defendant was staring the electric chair in the face, there was included in the *96 motion for a new trial the allegations that the juror Bloodworth had made contrary statements prior to the trial from those he gave on his voir dire, and that the statements made by him on his voir dire examination were false.
The trial Judge heard the witnesses in person and was in a better position than anyone else to pass upon their demeanor, bias, prejudice, interest and credibility. The motion simply had attached to it affidavits by the witnesses, but the witnesses appeared before the trial Judge in person and were examined and cross-examined. The trial Judge decided that the juror was not disqualified and that he was a fair and impartial juror. The State maintains that this determination by the trial Judge was final and conclusive.
Although this question was covered in the main opinion and many cases cited, we did not summarize any of the testimony given before the trial Judge except that of Bloodworth nor were all of the decisions of this Court on this question cited. We only cited the cases of Lamb v. State, 90 Fla. 844, 107 So. 530; Crosby v. State, 90 Fla. 381, 106 So. 741; and Irvin v. State, 19 Fla. 872.
The testimony concerning the juror Bloodworth was conflicting and some of the witnesses showed their interest, bias or prejudice. Witness Bost testified that he was in a barber shop and they were talking about whether or not the Grand Jury was going to indict North. He further testified:
"* * * I couldn't quote the exact words,  but the meaning I got from his conversation was that in his mind that Mr. North was guilty and that everything that, all the evidence that he had heard and read in the newspapers was pointing to that and that there is no need in arguing with him, that he couldn't change his mind on it. Now, that was the way that I understood his conversation."
The witness never made any direct and positive statement as to the words used by Bloodworth. The witness further testified:
"Well, I don't know. I mean whether he had his mind definitely made up or not. * * * That's what they were talking about as to whether or not the Grand Jury was going to get an indictment."
The witness himself did not believe that the defendant was guilty. He had followed the case, particularly, in the newspapers. He knew that Bloodworth's name was listed as a juror in the case before he was called as a witness on motion for new trial. He made no report to anyone about this alleged conversation. One of the attorneys for the defendant called the witness to come down to his office. The attorney prepared the affidavit and asked him to sign it. The witness did not attend the trial but based on what he read in the newspapers, he did not agree with the verdict. The attorney for the defendant requested him to sign the affidavit, and the witness testified:
"Well, it was to aid in getting a new trial for defendant."
At the time witness signed the affidavit he was not in agreement with the verdict and it was to help to get a new trial.
The witness Noah testified as to an alleged conversation in a pool room where he said that Bloodworth while in the pool room stated:
"* * * he believed that he [North] was guilty and he hoped he burnt for it."
Witness Noah said that his personal opinion was "certainly in disagreement with the verdict." The witness did not attend the trial and did not read all of the testimony in the papers. After the verdict he went to see the attorney for the defendant because he wanted to see justice done. The witness testified that it was possible that prior to the indictment and prior to the trial he had made a statement that in his opinion the defendant had been framed.
The witness Davis testified before the Judge that he did not believe that the defendant had gotten a fair trial. He testified that he heard the juror Bloodworth say (in the barber shop), "North sure as hell killed that woman but he will never be convicted." The witness did not tell *97 the attorney for the defendant about hearing this statement until the Saturday before the hearing.
The witness Noah testified about the conversation in the pool room and gave the name of Trulock as being present. Trulock testified that while playing pool, he asked Bloodworth what he thought about the North case, and that Noah broke in before Bloodworth could speak and said, "I don't think he is guilty. * * * I think he was framed," and that Bloodworth said nothing at all. Witness Trulock further testified that Bloodworth still said nothing; that he, Trulock, then told Noah that from what he could read in the papers, he thought North was guilty and then "it looked like he [Noah] got mad * * *." Trulock testified that all during this conversation Bloodworth said nothing; that Noah stopped playing pool as if he was mad; that after Noah had left, Trulock and Bloodworth went outside and he asked Bloodworth what he thought about the case and Bloodworth replied:
"I wouldn't say either way. * * * I will wait till twelve men decide the case and then I will talk after then."
Witness Grant testified that he knew North and that North had buried his mother-in-law on July 7th; that when he (Grant) was in a cafe, owned by the witness Bost, and Bloodworth was present, he heard Bloodworth say that he couldn't serve on that jury because he believed North was guilty; that Bloodworth said, "The son-of-a-gun is guilty," and that all the people in Polk County couldn't change his mind. Bloodworth was not talking to Grant and Grant did not know who he was talking to. Grant said it was "just gossip." Although Grant stated that Bost was present, and Bost also testified at this particular hearing as a witness for the appellant, Bost testified about a barber shop conversation but did not corroborate the witness Grant as to the cafe, or restaurant, conversation.
There were also conflicts in the testimony before the trial Judge and some of the affidavits filed by the witnesses.
A summary of Bloodworth's testimony before the trial Judge appears in the main opinion. It is in direct conflict with the testimony of Noah, Bost and others. Bloodworth testified that "my mind was open when I took the stand here and the oath. I told the truth. That my mind was open. That the State would have to prove to my knowledge before that I would deem him guilty."
Subsequent to the case of Irvin v. State, supra, the Court decided the case of Yates v. State, 26 Fla. 484, 7 So. 880, 885, and said:
"When affidavits are taken as in this case, and the evidence is conflicting, the verdict will not be set aside unless manifest injury has been done the accused, which is not shown in the case at bar. Romaine v. State, 7 Ind. 63; Commonwealth v. Knapp, 10 Pick. 477. Such questions as this must necessarily be left largely to the discretion of the trial judge, who may know the witnesses and be able to judge of their credibility. As to the discretion of the trial court in such cases, see People v. Taing, 53 Cal., 602; People v. Vasquez, 49 Cal. 560; People v. Cotta, 49 Cal. 166."
In the case of State v. Lauth, 46 Or. 342, 80 P. 660, 662, 114 Am.St.Rep. 873, the Court held:
"The exact function of the trial court as a trior of a juror's qualifications before trial, and the principle upon which its action in that regard may be revised, have been firmly settled in this state. State v. Saunders, 14 Or. 300, 12 P. 441; State v. Armstrong, 43 Or. 207, 73 P. 1022. As the trior of a juror's qualifications after verdict, when attacked for bias or prejudice rendering him unfit to sit in the cause, the function of the court is much the same as when it is sitting to make the inquiry before trial. It is held to the exercise of a sound legal discretion, and is amenable to revision only when it has abused that discretion. The reason commonly assigned for the rule is that the trial court has the opportunity of seeing the juror, of hearing him give his testimony, and of noting his *98 manner and demeanor while under examination; thus affording it advantages superior for determining the matters of inquiry to those accorded the appellate tribunal, which is furnished only with the dry facts upon paper. The rule is otherwise stated as requiring clear and palpable proofs to warrant a reversal of the trial court's determination.
"It follows, therefore, that, where affidavits and proofs are produced for and against which are conflicting and contradictory, and of somewhat even balance, so that it requires a precise estimate to determine as to the greater weight or preponderance, the trial court's conclusions will not be disturbed, unless they result in manifest injustice. * * *"
In the case of Cupps v. State, 120 Wis. 504, 97 N.W. 210, 220, 98 N.W. 546, 102 Am.St.Rep. 996, a similar situation existed. The Court said:
"It hardly needs argument to demonstrate that the finding of the trial court against the charge of unfairness as to Juror Vick, upon such evidence cannot be disturbed. There is at least clear warrant for saying that such finding is not against the clear preponderance of the evidence. It seems that if such evidence would warrant granting a new trial because of the unfairness of a juror, there would be very little stability to verdicts in cases of great public and private interest, such as this."
In the case of McGowan v. State, 89 Fla. 5, 102 So. 890, 892, this Court said:
"In a matter of this character, where a verdict is attacked upon the alleged disqualification of a juror, and the evidence of such disqualification is supported by ex parte affidavits, the rule requiring a clear and unequivocal statement by the accused and his counsel that they were ignorant of the disqualifying expressions before the jury was impaneled, that due diligence was exerted by them to discover the existence of any such disqualification, and that the matter must be left largely to the discretion of the trial judge, who may know the witnesses and be able to judge of their credibility, obtains in this state. See Yates v. State, 26 Fla. 484, 7 So. 880.
"After verdict, all presumptions of law are in favor of the juror's competency, and the burden of proof is upon one who attacks it. See 8 Ency. of Evidence, 986."
The opinion in that case was written by Mr. Justice Ellis and was concurred in by Justices Taylor, Browne, Whitfield, West and Terrell.
Probably the best-reasoned case on this question is that of Lamb v. State, 90 Fla. 844, 107 So. 530, 533, when this Court in an opinion by Mr. Justice Terrell said:
"The trial judge believed the statements of Stephens and Fulwood with reference to their qualifications as jurors, rather than the affidavit and testimony of Ethel Stephens, Tison, and Holsapple, supporting the charge of their disqualification, and under the circumstances as shown by the evidence we are unable to say that the trial judge's conclusion in the matter was not correct. On the record the effort to disqualify Stephens fell flat; and that to disqualify Fulwood appears to have been an afterthought on the part of friends of Lamb and distant relatives of such friends who appeared very much interested in his (Lamb's) acquittal. Tison, the man who was the most interested in the disqualification of Fulwood, knew of his alleged disqualifications before the trial came on, saw Fulwood qualify as a juror, sat in the courtroom through the trial, and then, after the verdict was returned and the jury discharged, for the first time makes known to Lamb's counsel his knowledge of Fulwood's disqualification. Taken in connection with the facts brought out in evidence, it is remarkably strange that he should have waited so long to charge Fulwood with being disqualified, and for this and other reasons apparent on the record, we think the finding of the trial court sets this question at rest.

*99 "* * * To the courts of the land and free citizens alike, trial by jury has been an object of deep and abiding interest, and any encroachment on this right has been viewed by them with alarm. For these reasons and many others, we believe that every juror should come to the investigation of each case free from any preconceived impression of it whatever; but when the jury has duly qualified and been accepted, to allow parties after the close of the trial of a cause to come in and file ex parte affidavits, and thus set at naught its finding, in our judgment would be equivalent to doing away with jury trials. With all the modern means of intercourse and communication now available to our people, it would be quite impossible to bring together twelve men for the trial of a cause like this who had not read or heard some part of the evidence or facts discussed, and from such as he has read or heard he may have some opinion, though not necessarily a fixed one that would not yield to competent evidence, as to the guilt or innocence of the one on trial; but when such juror in the presence of God and his country takes a solemn oath to try the issue according to all the evidence and facts presented, and meets every other requirement of the law to sit as a juror in said cause, and the trial judge, after having fully examined into all facts constituting his alleged incompetency and in the exercise of a sound discretion, has pronounced him qualified, if he is not qualified then it would be extremely difficult if not impossible to qualify a jury in most cases under our system."
In the case of Bauer v. State, 117 Fla. 674, 158 So. 168, this Court said:
"Plaintiff in error further contends that the judgment should be reversed because one Robert Nork, who qualified as a juror and became one of the jury trying the case, was in fact disqualified because the said Nork had expressed an opinion prior to his selection as a juror as to the guilt of the accused, and in effect had stated that he should be electrocuted. One witness testified that Nork had so expressed himself. Nork testified that he had not so expressed himself and had entertained no such preconceived opinion.
"The trial judge, therefore, had to determine the merits of this contention by deciding which of the persons testifying was speaking the truth. It is not made clearly to appear that the determination of the trial judge in this regard was erroneous."
This question has received consideration from text-writers and courts throughout the country. In 39 Am.Jur., in the article on New Trial, page 197, Sec. 198, the author states:
"* * * In view of the temptation to obtain a rehearing after an adverse verdict, particularly in a criminal case, and in view also of the facility with which affidavits for this purpose can be obtained, all such evidence should be scrutinized with the greatest care and caution. Where the affidavits and other proofs are conflicting and contradictory and somewhat evenly balanced, so that it requires a precise estimate to determine the greater weight or preponderance, the trial court's conclusion will not be disturbed, unless manifest injustice has been done. * * *"
Most of the testimony about what the juror Bloodworth said and his opinions is with reference to alleged conversations in a barber shop, a restaurant and a pool room. Everyone knows that gossip takes place in pool rooms, bar rooms, restaurants and barber shops. The gossip in a pool room is generally between pool players, and in a bar room, generally takes place between those who have entered for the purpose of imbibing alcoholic liquors. Men of all walks of life, including the preacher, doctor, carpenter, plumber, banker, pool player and those who drink alcoholic beverages, congregate in the barber shop. It is the place where important local affairs are discussed and even national and world-wide problems are debated and settled *100  even though the settlements don't last long. Opinions on all problems and questions  past, present and future  may be obtained in the barber shop. Even the witnesses for the appellant who testified concerning conversations in the barber shop, pool room or restaurant in this case, testified that the conversations were "just gossip."
It would, therefore, appear that where the question of the disqualification of a juror is raised for the first time after a verdict has been rendered and evidence outside of the record is necessary to determine the question, the trial Judge is in better position to make a determination than anyone else and when he hears the witnesses, even though there may be conflicts in their testimony, the determination of such trial judge is final and conclusive, unless it is clearly shown that his determination was an abuse of discretion or will result in a miscarriage of justice.
The question presented on the motion for a new trial is not whether the juror Bloodworth had read newspapers, heard any conversations, or talked to anyone about the case, but whether or not he had formed or expressed an opinion, and what his opinion was at the time of his voir dire examination. The motion for a new trial was on the ground that the juror Bloodworth had "formed a fixed opinion in his mind that this defendant was guilty of murdering the said Betty Albritton; that after her death, before this trial commenced, he expressed said fixed opinion of guilt  that at the time said juror was selected as a juror in this case he had the aforesaid fixed opinion and was not a fair and impartial juror." The above allegations contained in the motion raised a question of fact which could be determined only by the trial Judge. Under the law it was his duty to hear the testimony and determine the issue. No one claims that it was error for the trial Judge to perform his duty, hear the testimony and make a determination on this question of fact from all the evidence before him. The real assignment of error is that the trial Judge decided this question of fact against the appellant. There is no suggestion anywhere in the record that this determination by the trial Judge was influenced by fraud, bias, prejudice or any other improper motive. In the performance of his admitted duty, he did not decide the question of fact according to the desire of the appellant.
The law about this question  so firmly established and so long adhered to in this state should not be suddenly set aside or ignored in this case. The law does not mean one thing in one case or county, or before one Circuit Judge, and a different thing in another case, or county, or before a different Circuit Judge. There is nothing about this case which requires a different rule of law from that set forth in the above-cited cases under which others have paid the penalty exacted by the law. Equality before the law, and uniformity, as to person, place, practice and procedure in the courts are essential to the proper administration of justice.
In the petition for a rehearing the appellant again raises the question of the minister's appearance before the jury, the reading of Scripture and the offering of a prayer. It is admitted that the harmless error statute should apply with respect to the question of guilty, but it is insisted that if any erroneous procedure is permitted, it is harmful when considered in connection with the jurors' exercise of their discretion in deciding whether they should recommend mercy. It is insisted that there is a distinction between the question of guilt and the question of recommendation of mercy. It is true that there is a difference and when there are any extenuating facts or circumstances which may appeal to the jurors as justifying a recommendation for mercy, they, in the exercise of their discretion, are authorized to make such recommendation. In this case there was not one single extenuating circumstance to justify a jury in recommending mercy. The appellant was either guilty or he was not guilty. The jury found that he was guilty. If this finding by the jury was correct, then a most horrible, inexcusable, premeditated and heinous murder was committed. If harmless error did not influence the jury in determining *101 the guilt of the appellant, then it could not influence it in recommending mercy. When they made the first determination that the appellant was guilty of murder, the record shows no extenuating circumstance to justify a recommendation of mercy. When this woman was being murdered, there was no one present to plead mercy in her behalf.
The oath of every officer of this State, from Governor to Constable, concludes with the words "So help me God." The oath of the juror concludes with the same words. Those who do not believe in the existence of a Deity may affirm instead of taking the oath. To most of us, everything around us proclaims and is evidence of the existence of a Divine Being. After having taken the oath, concluding with the words, "So help me God," it was natural that the jurors would, of their own free will and accord, ask a preacher to Grace the table and to read a passage from the Bible. It was not reversible error for the preacher to respond and read a Psalm and pray for "Divine guidance." The scripture reading and prayer did not constitute harmful or reversible error in this case.
We have carefully considered the petition for rehearing in this case, and the same should be, and is, hereby denied.
THOMAS, SEBRING and DREW, JJ., concur.
ROBERTS, C.J., concurs in judgment to deny rehearing.
TERRELL and HOBSON, JJ., dissent.
HOBSON, Justice (dissenting).
I wish to record my reasons for voting to grant the petition for rehearing in this case. I do not believe that the harmless error rule or statute should apply in a first-degree murder case where the verdict is one of guilt without recommendation for mercy and particularly in such a case bottomed entirely upon circumstantial evidence.
I believe that error was committed when the bailiff permitted the evangelist or preacher to come into the dining room with the jurors, read from the Scriptures and offer prayer. It is true that the court had permitted the bailiff to take the jurors to church but the court did not authorize the bailiff to bring a preacher to the jury's dining room or into their presence for any purpose. Counsel for defendant certainly was not advised that such an act would take place and, being without knowledge, could not have objected thereto.
It is my view that in connection with the minister's appearance before the jury the harmless error statute should apply with respect to the question of guilt but that if any such erroneous procedure is permitted it is harmful when considered in connection with the juror's exercise of their discretion in deciding whether they should recommend mercy because no one can say what effect such error may have had upon the minds of the jurors. It is entirely possible, indeed to my mind it is probable, that an otherwise minor departure from proper and lawful procedure might have an influence upon the jurors when faced with the question of whether they should recommend mercy as distinguished from the question whether the defendant was guilty. The difference between making such recommendation and not making it is simply the difference between life and death.
Moreover, I am also of the opinion that the motion for a new trial should have been granted by the trial judge because of the serious question raised with reference to whether juror Bloodworth had testified falsely on his voir dire examination when he swore that he had not formed or expressed any opinion as to the guilt or innocence of the appellant. One of the witnesses testified that juror Bloodworth, who was a barber  a member of a group of artisans who are commonly known for their loquaciousness and freedom of expression of opinion  stated before the trial and before Bloodworth became a juror that "he believed that he (North) was guilty and he hoped he burned for it." Another witness testified that Bloodworth had said "I can't serve on that jury because I believe that he (North) is guilty. The son-of-a-gun is guilty. All the people in Polk County couldn't change my mind." *102 And there was other testimony to the effect that Bloodworth stated that "he (North) was guilty and it would take more arguments than what he could see to change it."
Bloodworth never did deny making the pretrial statements which five witnesses attributed to him. He consistently made statements similar to the following: "I don't remember ever expressing an opinion. I would say a fixed opinion." Such dubious denial is tantamount to an admission that he made the statements attributed to him. It is of no moment that the juror insisted on the hearing upon the motion for a new trial that he was influenced exclusively by the evidence, and the law as expounded by the Court. The statement of Bowman that he was influenced solely by the law and the evidence does not remedy the wrong. Pearcy v. Michigan Mutual Life Insurance Co., 111 Ind. 59, 12 N.E. 98, 60 Am.Rep. 673. His self-serving statement came too late. The prejudicial and harmful error had its genesis in the fact that juror Bloodworth on his voir dire examination, either intentionally or unwittingly, but the avenue of approach matters not, placed himself at least in a minatory quagmire of evasion and the accused in a prejudicial position from which at the time he could not extricate himself. I quote with approval from the opinion in the case of Bradbury v. Cony, 62 Me. 223, wherein the Court said:
"In the trial of causes, the appearance of evil should be as much avoided as evil itself. It is important that jurymen should be devoid of prejudice. It is hardly less so that they should be free from the suspicion of prejudice."
We are justly proud of the fact that under our form of government an accused, who until convicted is presumed to be innocent, is assured that he will be tried by a jury of his peers and, what is even more important, he is guaranteed that the jurors who sit in judgment upon him shall be fair and impartial. Every citizen of this State who is charged with any crime has the absolute right to a voir dire examination of each prospective juror. This is a valuable right and the degree of its importance actually, though possibly not theoretically, is magnified in proportion to the degree of seriousness of the offense with which he is charged.
It is not possible for one to know the degree of influence which this juror exerted upon his fellow jurors in connection with the exercise of their discretion in granting or withholding a recommendation for mercy, without consideration of the effect of his evidently predetermined attitude toward guilt.
It is not sufficient to say that the errors pointed out were harmless because the circumstantial evidence in this case is convincing. To my mind such reasoning when applied to juror Bloodworth's misconduct is somewhat similar to saying that a new trial should not be granted because the appellate court finds that the trial was fair. The Supreme Court of New Hampshire in the case of Shulinsky v. Boston & Maine R.R., 83 N.H. 86, 139 A. 189, 191, epitomized and pointed out clearly the unsoundness of such a holding when it said:
"Argument that a finding that the trial was fair is not pertinent. The question is whether a proper tribunal was established, and not whether an improperly established tribunal acted fairly." (Italics supplied.)
See also Texas Employers' Insurance Association v. Wade, Tex.Civ.App., 1946, 197 S.W.2d 203.
I would apply to this case the law so ably pronounced by the Supreme Court of Indiana in the case of Pearcy v. Michigan Mutual Life Insurance Co., supra, which opinion we recently cited with approval in the cases of Loftin v. Wilson and Mills v. Wilson, Fla., 67 So.2d 185. I quote encomiastically from the Indiana Court [111 Ind. 59, 12 N.E. 99]:
"It is of high importance to a litigant that the triers of his cause should be impartial and disinterested men, and the law makes careful provision for securing him this right. In speaking of this right, the court of appeals of New York said: `The object of the law is to procure impartial, unbiased persons as jurors. They must be omni *103 exceptione majores. They must have no interest in the subject-matter of the litigation.' Diveny v. City of Elmira, 51 N.Y. 506. The supreme court of Nebraska declared a like doctrine in Ensign v. Harney, 15 Neb. 330, 18 N.W. 73, 48 Am.Rep. 344, where it was said: `Unless fair-minded, unbiased jurors can be selected, a trial becomes a mere farce, dependent, not upon the merits of the case, but upon extraneous circumstances, such as the bias, prejudice, or interest of the jury. To determine the competency of a juror, an oath is administered to him, and he is required to answer all questions touching his qualifications as a juror, not generally, but in that particular case. Great latitude is allowed in such examinations, and, if it appears probable that the juror is not indifferent between the parties, he is excluded.' Other courts have asserted a similar doctrine. * * * So in Melson v. Dickson, 63 Ga. 682, 36 Am.Rep. 128, it was said: `A big part of the battle is the selection of the jury, and an impartial jury is the corner-stone of the fairness of trial by jury.' The principle is so plain and just that it needs little more than a bare statement, and we refrain from further reference to authorities, although they are very abundant.
"The examination of a juror on his voir dire has a twofold purpose, namely, to ascertain whether a cause for challenge exists, and to ascertain whether it is wise and expedient to exercise the right of peremptory challenge given to parties by the law. It is often important that a party should know the relation of a person called as a juror to his adversary, in order that he may interpose a challenge for cause, or exercise his peremptory right to challenge. It is the duty of a juror to make full and truthful answers to such questions as are asked him, neither falsely stating any fact, nor concealing any material matter, since full knowledge of all material and relevant matters is essential to the fair and just exercise of the right to challenge either peremptorily or for cause. A juror who falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, is guilty of misconduct, and such misconduct is prejudicial to the party, for it impairs his right to challenge. In this instance the appellant had a right to a full and truthful answer from Bowman, and it was his duty to make that answer without evasion, equivocation, or concealment." (Italics supplied.)
See also White v. State, 129 Fla. 885, 176 So. 842; 39 Am.Jur. 65, Sec. 45; Johnson v. Tyler, 1 Ind. App. 387, 27 N.E. 643; Texas Employers' Insurance Association v. Wade, Tex.Civ.App., 197 S.W.2d 203, supra; Gibney v. St. Louis Transit Co., 204 Mo. 704, 103 S.W. 43; Kelley v. Adams County, 113 Neb. 377, 203 N.W. 544; Paducah T. & A.R. Co. v. Muzzell, 95 Tenn. 200, 31 S.W. 999; Tegarden v. Phillips, Ind. App., 39 N.E. 212; City of Dayton v. Perry, Ohio App., 44 N.E.2d 381; Griffith v. State, 31 Ala.App. 432, 18 So.2d 284; Jones v. Imperial Garages, Or., 145 P.2d 469.
For the reasons stated herein I vote to grant the petition for rehearing and would reverse this case for a new trial.